UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

           - v. -                    :        (S7) 98 Cr. 1023 (LAK)

WADIH EL HAGE,                    :

               Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**RE-SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                              PREET BHARARA
                              United States Attorney
                              Southern District of New York
                              for the United States
                              of America


Sean S. Buckley
Aimee Hector

       Assistant United States Attorneys
        Of Counsel

# Table of Contents

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.     Al Qaeda. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.     El Hage Understood and Was Party to Al Qaeda's Anti-American
              Goals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.     El Hage's Leadership Role in Al Qaeda's East Africa Cell.. . . . . . . . . . 11

        D.     El Hage's Continued Activities on Behalf of Al Qaeda in the Wake of Al
              Qaeda's Declaration of War on the United States. . . . . . . . . . . . . . . . . 14

        E.     El Hage Returns to the United States After Being Confronted by U.S. Law
              Enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        F.     El Hage's Initial Lies to the Grand Jury.. . . . . . . . . . . . . . . . . . . . . . . . . 19

        G.     Bin Laden's 1998 Directive to Kill American Civilians and Military
              Alike.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        H.     The Bombings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        I.     El Hage's Continued Lies to U.S. Law Enforcement. . . . . . . . . . . . . . . 21

II.    THE SENTENCING GUIDELINES CALL FOR LIFE IMPRISONMENT. . . . . . . . . 22

        A.     The Probation Office's Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.     El Hage's Objections to the Probation Office's Guidelines
               Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

              1.     The Defendant's Reliance on Desnoyers Is Misplaced. . . . . . . . 27

              2.     The Harun Autobiography Does Not Provide a Compelling Reason
                  to Revisit Judge Sand's Guidelines Calculations.. . . . . . . . . . . . 30

i

## Table of Contents
### (Cont'd)

a.    The Application of the 15-Level Enhancement Pursuant to U.S.S.G. § 2A1.1 Would Be Appropriate Even If the Harun Autobiography Is Considered. . . . . . . . . . . . . . . . . . . . . . 32

b.    The Application of the 3-Level Enhancement Pursuant to U.S.S.G. § 3B1.1(b) Would Be Appropriate Even If the Harun Autobiography Is Considered. . . . . . . . . . . . . . . 36

III.    THE STATUTORY SENTENCING FACTORS CALL FOR A LIFE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.    Each of the Section 3553(a) Factors Weighs Heavily in Favor of a Life Sentence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Call for a Life Sentence. . . . . . . . . . . . 40

2.    A Life Sentence Serves the Goals of Deterrence, Just Punishment, and Respect for the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

3.    El Hage Should Receive the Same Sentence as his Co-Defendants. . . . . 50

4.    Imposing a Guidelines Sentence Would Advance the Goals of Section 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    El Hage Is Not Entitled to Sentencing Leniency on the Basis of Information He Was Compelled to Provide to the Government. . . . . . . . . . . . . . . . . . . . . . . . . 57

C.    El Hage's Conditions of Confinement Do Not Warrant Sentencing Leniency Under Section 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

        - v. -            :            (S7) 98 Cr. 1023 (LAK)

WADIH EL HAGE,            :

            Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA[1]

### PRELIMINARY STATEMENT

On May 29, 2001, following a six-month trial, a jury sitting in the Southern

District of New York returned verdicts of guilty against Wadih el Hage (the "defendant" or "el

Hage"), convicting him of the following conspiracies: (i) to kill United States nationals wherever

and whenever they were found, in violation of Title 18, United States Code, Section 2332(b)

(Count One); (ii) to murder United States government employees and internationally protected

persons, in violation of Title 18, United States Code, Section 1114 (Count Three); and (iii) to

destroy buildings and property of the United States, in violation of Title 18, United States Code,

Section 844(n) (Count Five).  The jury also convicted el Hage of multiple counts of perjury for

lying to the Grand Jury about his knowledge of, and association, with al Qaeda and its leaders

and members, in violation of Title 18, United States Code, Section 1623 (Counts 287-305), and

three counts of making false statements to FBI agents regarding the same, in violation of Title 18,

---

[1]     The Government respectfully requests that the instant submission be filed under
seal because it contains information covered by the Protective Order in this case.  Prior to the
sentencing hearing, the Government will publicly file a redacted version of its submission.

United States Code, Section 1001 (Counts 306-08).

On October 18, 2001, the Honorable Leonard B. Sand sentenced el Hage to life imprisonment on Counts 1 and 3, twenty years' imprisonment on Count 5, and 5 years' imprisonment on each of Counts 287 through 289, and 291 through 305, with all sentences to run concurrently.  Judgment was entered on October 22, 2001.  El Hage appealed his life sentence on several grounds.  Following extensive appellate briefing and oral argument, the Court of Appeals rejected all but one of el Hage's arguments, and thereby affirmed each and every one of Judge Sand's legal and factual findings.  The sole exception was that the Court of Appeals determined, on consent of the Government, that Judge Sand imposed sentence pursuant to a mandatory application of the Guidelines in violation of <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005).  On November 24, 2008, therefore, the Court of Appeals remanded the case to this Court for the sole purpose of re-sentencing the defendant pursuant to <u>United States</u> v. <u>Fagans</u>, 406 F.3d 138 (2d Cir. 2005).  <u>See</u> <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d 93, 155 (2d Cir. 2009).

The Government writes respectfully to set out its position with respect to the defendant's re-sentencing, which is scheduled for April 23, 2013.

In short, the defendant is a U.S. citizen who worked at the core of al Qaeda for years in the run-up to the Embassy bombings plot and, along with his co-conspirators, participated in the brutal murder of hundreds of innocent people.  The United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") call for a sentence of life imprisonment, and the United

States Probation Office ("Probation Office") again has recommended a life sentence.[2]  That is the

sentence that justice demands, and that is the sentence that should be imposed.

As the Court is aware, the sentencing process typically involves three steps:

material factual disputes must be resolved; the Sentencing Guidelines range must be calculated;

and then, in light of the facts, the Guidelines, and Title 18, United States Code, Section 3553(a)

("Section 3553(a)"), an appropriate sentence must be imposed.  Here, however, that process has

been abbreviated because of the extensive, prior litigation before Judge Sand and the Court of

Appeals.[3]  As such, and consistent with the mandate of the Court of Appeals, the sole issue

before the Court today is to determine the appropriate sentence to impose on the defendant in

view of the Section 3553(a) factors.  See Fagans, 406 F.3d at 142 (affirming district court's

Guidelines calculations, but vacating sentence and remanding for re-sentencing in conformity

---

[2]      The Probation Office originally issued its Presentence Report on August 22, 2001.
On September 11, 2009, following the remand to this Court, the Probation Office prepared a
supplement, which attached the August 2001 Presentence Report.  In that supplement, the
Probation Office concluded that its recommendation of life imprisonment "remain[ed]
unchanged," because it concluded that it "does not believe there are any factors that would result
in a non-guidelines sentence pursuant to 18 U.S.C. 3553(a)."  The Presentence Report, including
the September 2009 supplement, will be referred to herein as the "Presentence Report" or the
"PSR."

[3]      In connection with the 2001 sentencing, defense counsel proposed that the
sentencing proceed in three stages.  During "Stage One," counsel for el Hage identified the issues
they intended to raise on the defendant's behalf.  During "Stage Two," defense counsel presented
the factual contentions and support for the defendant's position with respect to those issues.
Finally, during "Stage Three," defense counsel presented legal arguments on el Hage's behalf.
Thereafter, Judge Sand conducted a two-phase sentencing proceeding.  On October 17, 2001,
Judge Sand presided over a hearing during which he resolved the legal and factual contentions
raised by el Hage in his staged submissions.  See Ex A (10/17/2001 Tr.).  Thereafter, on October
18, 2001, Judge Sand heard (and resolved) the defendant's applications for downward departures,
and imposed sentence.  See Ex B (10/18/2001 Tr.).

with <u>Booker</u>);[4] <u>see also</u> Def. Oct. Mem. at 3 (noting that the defendant's numerous objections to the Presentence Report "were rejected by Judge Sand," and "the Second Circuit affirmed Judge Sand's application of the Guidelines to Mr. El-Hage"); <u>see also id.</u> at 9 (conceding that the defendant's objections to the Guidelines enhancements "were rejected by both Judge Sand and the Second Circuit").[5]

As to the facts, el Hage was a high-ranking and trusted associate of Usama Bin Laden who advanced al Qaeda's war of terror on the United States by performing essential tasks on behalf of the organization for several years in the run-up to the Embassy bombings.  El Hage disbursed the al Qaeda payroll at a time when the group's internal discussions made clear that it violently opposed the United States; procured equipment for al Qaeda, including an airplane capable of transporting "Stinger" (<u>i.e.</u>, anti-aircraft) missiles to al Qaeda; operated al Qaeda businesses, which provided cover for operatives and generated cash for the group; operated as one of the leaders of al Qaeda's East Africa cell; provided false identification documents to the group, so operatives could travel undetected from country to country; and traveled to Afghanistan

---

[4]      In the prior proceedings, and on appeal, el Hage previously raised several objections to Judge Sand's Guidelines calculations, and raised several factual arguments in support of his requests for downward departures.  Those objections and arguments previously were rejected by Judge Sand, and Judge Sand's rulings thereafter were affirmed by the Court of Appeals.  In connection with his re-sentencing, el Hage once again has raised those arguments but has now recast them as Section 3553(a) factors.  Although these arguments are properly before this Court in the form of 18 U.S.C. § 3553(a) considerations, it is important to note that nearly all of these arguments were rejected based on the Court's finding that the argument rested on a factual predicate that was not supported by the evidence at trial or the jury's verdict.  The Government will cite to those findings as relevant throughout this brief.

[5]      The defendant has submitted two separate sentencing memoranda to the Court in connection with his re-sentencing.  The first, dated October 28, 2009, will be referred to herein as the "Defendant's October Memorandum" or "Def. Oct. Mem."  The second, dated March 25, 2013, will be referred to herein as the "Defendant's March Memorandum" or "Def. Mar. Mem."

for secret meetings with al Qaeda leaders, after which el Hage returned to Nairobi with messages from Bin Laden to his followers regarding his terrorist plans   including a specific directive from al Qaeda's military council to militarize the East Africa cell of which he was a leader.  El Hage also obstructed the investigation into al Qaeda, and thus protected and furthered al Qaeda's terrorist agenda, by repeatedly lying to a federal grand jury about his relationship with and knowledge of al Qaeda and its leaders.  See infra Part I (Offense Conduct).

As to the Guidelines, the Probation Office calculated that the applicable Guidelines sentence is a term of life imprisonment.  This is based on an offense level of 66   an offense level that is far beyond the level that yields a life sentence.  Under controlling Second Circuit law, and as specifically affirmed by the Court of Appeals in this case, the Probation Office's Sentencing Guidelines calculation is correct.  See infra Part II.A.

Finally, as to the Section 3553(a) factors, each of these strongly supports the imposition of a life sentence.  The defendant's crimes were horrific, and terrorists must be deterred by imposing the maximum available sentence.  See infra Part III.A.

The defendant, however, seeks leniency under Section 3553(a).  First, the defendant argues that, although he bears "legal responsibility for the conspiracies for which he was convicted," the Guidelines severely overstate his role in the offense.  Although he professes to accept responsibility, at base the defendant's motion on this point constitutes a thinly veiled attempt to relitigate facts pertaining to his culpability and/or knowledge of the actual bombings arguments that previously have been rejected both by Judge Sand and the Court of Appeals.

The record and jury verdict in this case make clear that no relief from a life sentence is warranted on this basis.  Second, the defendant points to the fact that he provided

information to the FBI prior to the Embassy bombings, and seeks to justify the intentional falsehoods that he provided to the FBI and the Grand Jury as misunderstood truths.  Cooperation warrants leniency in part because it shows that a person has begun morally to reform.  The defendant, who is unrepentant, and who continued to conceal his knowledge of al Qaeda's workings even in the wake of the Embassy bombings, plainly has not reformed.  See infra Part III.B.  Finally, the defendant argues that his personal circumstances    including the conditions of his confinement and his family    warrant a sentence less than life imprisonment.  Those factors, even as overstated in the defendant's brief, when compared to the atrocities committed by the defendant and his co-conspirators, do not even begin to justify any sentence less than life.  See infra Part III.C.

Most fundamentally, the defendant's requests for leniency under Section 3553(a) fail for the same basic reason: the defendant is an al Qaeda terrorist who operated at the heart of each of the conspiracies for which he was convicted.  He is a terrorist who, despite repeated opportunities to break away from the conspiracies of which he was convicted, instead decided to distract attention from his co-conspirators, return to the United States, and deceive the FBI.  As a result of his efforts on behalf of al Qaeda, and the lies he told to the FBI, el Hage is a terrorist responsible for causing enormous suffering to innocent victims.  Even to this day, after trial, conviction, and appeal, the defendant still seeks to minimize his role in those murderous conspiracies and continues to deny responsibility for his actions.  That is why the Guidelines and the Probation Office call for a life sentence, and that is why the defendant is undeserving of the

Court's mercy.[6]

## I.   FACTUAL BACKGROUND

As set forth below, the trial evidence overwhelmingly established that the bombings of the United States Embassies in Kenya and Tanzania were the culmination of years of plotting by al Qaeda.  While el Hage did not build or detonate the bombs that took 224 innocent lives on August 7, 1998, his conduct on behalf of the al Qaeda organization laid the ground work for, and therefore enabled the accomplishment of that despicable act.  And when he first was confronted by the FBI and he realized that U.S. law enforcement had identified him as a potential inroad into al Qaeda's secret plots, el Hage made the calculated decision to reduce law enforcement scrutiny of the activities of his co-conspirators by moving to the United States where he lived openly under his true identity, all the while hiding in plain sight while his co-conspirators continued to execute the plan to destroy the Embassies and murder 224 innocent people.

The defendant's continued attempts to disclaim responsibility for the violent and murderous accomplishment of the ultimate goal of the al Qaeda organization, hold neither legal nor moral weight.  El Hage cannot distance himself from the murderous goals of organization in which he was a key player, and his assertions that those aims were unknown to him or that he did not engage in efforts designed to help carry them out should be rejected.  The evidence, and the jury's verdict, belie his claims.

---

[6]      Given the number of claims raised by the defendant, and the breadth of the record here, the Government respectfully requests permission to submit this memorandum, despite the fact that it exceeds the page limits set forth in the Court's rules.

### A.    Al Qaeda

The Embassy bombings plot was a conspiracy conceived and orchestrated by al Qaeda.  See, e.g., PSR ¶¶ 85-115.

Al Qaeda is an international terrorist group dedicated to opposing secular, non-Islamic governments with force and violence; it was formed in the late 1980s.  See PSR ¶¶ 51-52.  Throughout the relevant period, Al Qaeda functioned in part through a central command and control structure headed by its "Emir," Usama Bin Laden.  See PSR ¶ 51.

Almost from its inception, Al Qaeda opposed the United States.  See PSR ¶¶ 52-59.  One of Al Qaeda's principal goals was to drive the United States out of the Saudi Arabian peninsula and the Horn of Africa through violence.  See PSR ¶¶ 53, 62-63.

### B.    El Hage Understood and Was Party to Al Qaeda's Anti-American Goals

Al Qaeda's terrorist objectives, and its particular focus against the United States, were well known to el Hage even prior to the time period of the charged conspiracy.  El Hage was a key player in the al Qaeda organization during the formulation and dissemination of its anti-American agenda.

In 1989, Bin Laden moved al Qaeda's headquarters and weapons cache to the Sudan, where al Qaeda rented guesthouses for its members and farms that it would convert into training camps.  See Tr. 215, 220-22, 246, 272-74, 515-16, 889.[7]  Al Qaeda held weekly meetings of its inner circle at one of those farms.  See Tr. 262-63, 517.  At those meetings, members and trusted associates discussed al Qaeda's increasingly radical agenda and began to

---

[7]    "Tr." refers to the 2001 trial transcript.  "GX" refers to a Government exhibit at the 2001 trial.  Copies of the 2001 trial transcript as well as the relevant trial exhibits cited herein are included on a DVD being submitted to the Court with this memorandum.

focus on ways forcibly to eradicate United States soldiers from predominantly Muslim lands in which they were stationed.  See Tr. 263-66, 517-19.  El Hage attended a number of these meetings and frequently resided at al Qaeda's Sudanese guesthouses along with other top al Qaeda officials, including Bin Laden, Mohamed Atef, Abu Ubaidah al Banshiri, Mamdoah Salim, and Madani al Tayyib.[8]  See Tr. 259-64, 961-62, 1253.  Only those who were familiar with, and subscribed to, the group's extremist agenda were permitted at these guesthouses.  See Tr. 962.

Al Qaeda's targeting of the United States was increasingly apparent throughout the early 1990s.  In 1992, at one of the weekly meetings, Bin Laden issued a "fatwah," or directive, instructing his followers to remove "the American army [from] the Gulf area" by "fight[ing] them."  See Tr. 265-66. Later that year, Bin Laden added the American forces in Somalia as a target for jihad, exhorting his followers in another fatwah to "cut" off the "head of the snake."  See Tr. 267-70, 280-81.  In Bin Laden's extremist view, jihad meant fighting and destroying any and all governments that were perceived as hostile toward Muslims.  See Tr. 177-78, 189-90, 192, 196-97.  The fatwah even permitted the killing of innocent civilians in the process, if necessary. See Tr. 269-70, 521.

Amidst these proclamations, el Hage assumed significant responsibilities in the al Qaeda organization.  For example, al Qaeda established a number of businesses in the Sudan.

---

[8]      Mohamed Atef and Abu Ubaidah al Banshiri led al Qaeda's military committee, which planned and oversaw the execution of all terrorist operations and trained new members to perform acts of jihad.  See PSR ¶ 57.  Mamdoah Salim was a religious scholar responsible for justifying the killing of Americans through his interpretation of ancient religious texts.  See, e.g., PSR ¶ 65.  Madani al Tayyib led al Qaeda's money and business committee, which ran businesses that funded and served as a cover for al Qaeda.  Tayyib recruited el Hage to work for Bin Laden.

See Tr. 239-46.  Although these companies conducted some facially legitimate business, they were, in reality, fronts used by al Qaeda to carry out and fund its terrorist operations.  See Tr. 353, 897-903, 1041.  Al Qaeda used these companies to move weapons and to acquire fake identities and travel documents for its operatives to evade the scrutiny of border guards around the world.  See, e.g., Tr. 214-15, 285-86, 353, 1041.  Most importantly, the businesses provided al Qaeda with the cash flow necessary to fund its ultimate violent terrorist objectives.  See Tr. 251-53.  These companies and other al Qaeda businesses were run out of an eight-room office in Khartoum.  See Tr. 246.  At times, Bin Laden worked out of this office, as did other important al Qaeda members who held high-level jobs at these companies, including Salim and al Tayyib.  See Tr. 248-51.  El Hage also had his own office space within the Khartoum office, making him privy to all of al Qaeda's affairs.  See Tr. 257-60, 418-19, 571-72, 961-65.

El Hage's work for al Qaeda's businesses evinced a determination to further al Qaeda's terrorist agenda, not mere knowledge or acquiescence in that agenda.  In fact, one of el Hage's specific responsibilities was to dispense al Qaeda's payroll in the Sudan, including payment to individuals who were pursuing jihad on al Qaeda's behalf, including activities targeting United States armed forces.  See Tr. 253.  Al Qaeda maintained a two-tiered salary structure: a single salary for those who worked exclusively for Bin Laden's businesses; and an additional salary for those who also worked to further al Qaeda's extremist agenda and pursue jihad on al Qaeda's behalf.  See Tr. 259, 908-09.  At the same time that el Hage assumed responsibility for al Qaeda's payroll, al Qaeda operatives were training Somali tribesmen to fight United States and U.N. forces.  See Tr. 258-59, 908-09.  As a result of his payroll responsibilities, el Hage had access to al Qaeda's personnel files and the activities of each al

10

Qaeda member and associate. See Tr. 259. In other words, el Hage knew exactly which militants were entitled to a supplemental salary for pursuing jihad in Somalia and provided payment for their efforts.

In addition to paying the salaries of al Qaeda's members pursuing jihad, el Hage attempted to procure and move weapons on behalf of al Qaeda. For example, in or about 1993, el Hage asked Essam al Ridi to purchase an airplane for Bin Laden that would be capable of transporting Stinger missiles from Afghanistan to the Sudan. See Tr. 558-65, 578-79. Although al Ridi never transported weapons in Bin Laden's airplane, he did    again at el Hage's request fly five individuals, including Mohamed Atef, the third-ranking member of al Qaeda, from the Sudan to Nairobi, Kenya. From there, the five men transited to Somalia for the purpose of training Somali tribes to attack U.N. and United States troops. See Tr. 283, 422-23, 577-80, 1172-75, 1273-74.

### C.    El Hage's Leadership Role in Al Qaeda's East Africa Cell

During the early 1990s, Al Qaeda set up a base of operations in Nairobi, Kenya; the base was intended to facilitate the transport of al Qaeda trainers and supplies to Somalia. See PSR ¶ 66; Tr. 1171-72, 1176-77 (testimony of L'Houssaine Kherchtou); see also Exhibit C (FBI Report of Interview of Mohamed Sadeek Odeh, dated August 31, 1998 ("Odeh Statement")), at 6 (describing Al Qaeda's relocation to East Africa).[9] After United States and U.N. troops left

---

[9]    The Odeh Statement is admissible in their entireties in the sentencing context. See, e.g., United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994) ("when determining sentence, a sentencing court is free to consider hearsay evidence"); Rule of Evidence 1101(d)(3) (hearsay rule inapplicable at sentencing); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); see generally infra.

Somalia, al Qaeda reorganized these operatives into a terrorist cell.  See Tr. 1186-93.

           In 1994, el Hage relocated from al Qaeda's headquarters in the Sudan to Nairobi, Kenya and assumed even greater responsibilities in the al Qaeda organization.   In the fall of 1994, the then leader of the Nairobi cell, Khalid al Fawwaz, was arrested.  See Tr. 1210, 1251-52.  El Hage was chosen to replace al Fawwaz as the leader of al Qaeda's Nairobi cell   the same cell that eventually carried out the attacks on the American embassies in Nairobi and Dar es Salaam.  See Tr. 1210, 1251-52.

           While he led the Nairobi cell, el Hage traveled with Mohammed Atef, a high-ranking al Qaeda leader and a member of its military committee, and participated in secret meetings with Atef at el Hage's residence.  See Tr. 1258-59.  In addition, el Hage was tasked with high-level operations on behalf of al Qaeda and its efforts to conceal its military secrets. For example, when Abu Ubaidah al Banshiri, the al Qaeda military commander, died in a ferry accident on Lake Victoria, el Hage was dispatched to the scene along with Fazul Abdullah Mohammed, a/k/a "Harun" ("Harun"), one of the key operatives who planned and participated in the Embassy bombings.  See Tr. 652-54.  El Hage's mission was to determine whether al Banshiri had in fact died, to locate his body, and, most importantly, to determine whether any al Qaeda secrets had been compromised by the former military commander's death.  See Tr. 647-48, 653-54, 1264, 1660; GX 82A, 82B, 359-T. After their investigation, el Hage and Harun wrote a report on the results of their investigation for the al Qaeda leadership. See GX 359-T.

           During his time in Nairobi, el Hage also was responsible for coordinating al Qaeda's activities with seemingly legitimate businesses and non-government organizations ("NGOs").  For example, a Saudi-based NGO, Mercy International Relief Agency ("MIRA") had

12

established a Nairobi-based office.  Although MIRA originally had been established to assist in

relief efforts in Kenya and Somalia (e.g., buying livestock, digging wells for water, building

mosques), it came to serve a dual purpose.  Specifically, the Nairobi office's former director was

an al Qaeda member, who used MIRA's status as an NGO to facilitate al Qaeda's efforts in

Somalia.  See Tr. 1187-88.  In particular, MIRA would "employ" al Qaeda members and provide

them with identification cards, thereby making it easier for them to travel to and from Somalia by

posing as relief workers.  See id.  (describing ties between al Qaeda leaders and MIRA).

   As such, MIRA was one of the fronts used by al Qaeda to obtain travel documents

for al Qaeda trainers transiting through Kenya to Somalia.  See Tr. 1662 (describing Harun's

activities at MIRA on behalf of al Qaeda); see also Ex C (Odeh Statement) at 21 (describing

MIRA).  And as described infra, evidence seized during searches conducted in the wake of the

bombing established el Hage's role in preparing falsified travel documents.

   At some point, MIRA's headquarters in Saudi Arabia learned of how al Qaeda

was using the NGO and ceased issuing identification cards to al Qaeda members.  As a

consequence, el Hage ultimately established another NGO   Help Africa People   which it used

similarly to MIRA.  See Tr. 1278-79 (describing el Hage's founding of Help Africa People and

how el Hage and Harun had identification cards from Help Africa People); Tr. 1661-62

(describing how Odeh received an identity card from Help Africa People); Tr. 3047-48

(describing how el Hage and Harun were employees of Help Africa People); Tr. 4289-90

(describing how Abu Ubaidah al Banshiri had discussed Help Africa People); see also Ex C

(Odeh Statement) at 22 (describing employment at "Wadih's NGO Africa Help").

   In addition to assisting with the NGOs, el Hage also assisted al Qaeda through

13

other seemingly legitimate business ventures, including selling gemstones. For example,

L'Houssaine Kherchtou described how el Hage would sell diamonds on behalf of Abu Ubaidah

al Banshiri. See Tr. 1261-62. Similarly, el Hage provided al Qaeda funding to other co-

conspirators, including Mohammed Sadeek Odeh, so that they could conduct a fishing business

to develop additional revenue for al Qaeda's Nairobi cell. See PSR 134; see also Ex C (Odeh

Statement) at 6, 9.

> **D.     El Hage's Continued Activities on Behalf of Al Qaeda in the Wake of Al Qaeda's Declaration of War on the United States**

In 1996, Usama Bin Laden issued a public declaration of holy war, or "jihad," on

the United States. See PSR ¶ 56; see also Government Exhibit 1600-T (translation of declaration

of war). Bin Laden called on Muslims to attack American soldiers. See PSR ¶ 56; see also

Government Exhibits 80, 80-T (1997 interview with Usama Bin Laden).[10]

During this time, el Hage's stature within the al Qaeda organization, and his

knowledge and participation in its terrorist activities, is no more amply demonstrated than by his

access to Bin Laden himself. As leader of the Nairobi cell, el Hage traveled to Afghanistan to

meet with Bin Laden directly, and personally disseminated Bin Laden's instructions to members

of the Nairobi cell. In fact, el Hage delivered Bin Laden's crucial message directing the Nairobi

cell to prepare for military action.

---

[10]     These directives were received by al Qaeda operatives residing in East Africa the same al Qaeda operatives who had worked under the auspices of el Hage prior to his departure from Kenya in September 1997  who described themselves as the "implementers" of Al Qaeda's plans. See GX 300A-T at 4 (translation of 1997 security report). As described in more detail below, in that report, al Qaeda's leadership was told that the "East Africa crew" had received news of al Qaeda's declaration of war against the United States, and that the "crew of East Africa" was taking careful security measures because "they are America's primary target[.]" GX 300A-T.

In February 1997, a few months after Bin Laden declared war against the United States by issuing his "Declaration of Jihad against the United States," see GX 1600-T, el Hage traveled to Afghanistan to meet with Bin Laden and Atef.  See, e.g., GX 211A-T, 211C-T, 211D-T, 310-74A-T, 358, 632A-T, 632B-T.  Following this meeting, el Hage returned to Nairobi with instructions from Bin Laden for a "new policy"    a directive to militarize the Nairobi cell.  The importance of el Hage's visit was underscored by the flurry of calls between el Hage and the al Qaeda leadership in the days leading up to the visit, during which el Hage contacted Bin Laden via the organization's satellite telephone.[11]  See, e.g., GX 304 at 27, 350, 594, 621B, 621C.

Moreover, el Hage kept other Nairobi cell members apprised of the progress of his visit during the trip.  See GX 210A-T; GX 212A-T.  El Hage's messages to cell members were relayed to other al Qaeda operatives    including Mustafa Fadhil, "Shuaib," and co-defendant Mohamed Sadeek Odeh, all of whom also later played important roles in the Embassy bombings operation.  See, e.g., GX 211A-T, 211C-T, 211D-T.

El Hage again returned to Afghanistan to meet with Bin Laden in August 1997.  See GX 246-T.  This meeting, and events that occurred simultaneously with it, evidence El Hage's high-level role in the al Qaeda organization as a trusted insider and confirm that el Hage possessed crucial information about al Qaeda's criminal objectives    information that al Qaeda

---

[11]      On November 1, 1996, al Qaeda purchased a satellite telephone in Long Island, New York, because it wanted to ensure that its communications remained secure.  See Tr. 3028; GX 592, 593, 1625, 1626D.  Al Qaeda used the satellite telephone to advance its terrorist agenda.  El Hage, al Fawwaz and other co-conspirators communicated with al Qaeda headquarters using the satellite telephone, see, e.g., GX 594, 621C, and el Hage and al Fawwaz both had the satellite telephone number in their address books.  GX 304 at 11; see also GX 1629, 1631.  El Hage carefully guarded the existence of the satellite telephone.  In el Hage's address book, the number for the satellite telephone was next to a coded entry for Atef.  See GX 304 at 11. Moreover, during an intercepted telephone call, el Hage used code to pass the satellite telephone number to Harun.  See GX 218A-T.

15

wanted safeguarded from public view.  El Hage's second trip to meet Bin Laden in Afghanistan

came at a critical juncture for the Nairobi cell, when al Qaeda was extremely concerned about a

security breach resulting from the arrest of al Tayyib, the high-level al Qaeda member and former

leader of the money and business committee.  See GX 645.

The discussions among al Qaeda members      evidently various documents and

intercepted telephone calls      about the implications of al Tayyib's arrest for the Nairobi cell

confirm el Hage's full and knowing participation in the al Qaeda-led conspiracies to kill United

States nationals and harm United States property.  Many of those documents and telephone calls

involved Harun, who gathered information about al Tayyib's arrest and prepared a report

referred to at trial as the "Harun Security Report"      about the potential implications of Tayyib's

arrest.  For example, on August 2, 1997, Harun faxed a letter to al Fawwaz, the former Nairobi

cell leader, in London.  See GX 246-T.  In that letter, Harun expressed concern about whether al

Tayyib's arrest would present problems for el Hage and his work for al Qaeda, and asked al

Fawwaz to "provide us with the sufficient information on this manager [Tayyib]" because Harun

did not know whether Tayyib knew of el Hage and the East Africa cell.  See GX 246-T.[12]

Indeed, Harun was concerned for el Hage's safety in the wake of Tayyib's arrest because el Hage

had traveled to Bind Laden, but had not yet returned.  Id.

Further communications during this period foreshadow el Hage's travel to the

United States to avoid law enforcement scrutiny.  A few days later, in an intercepted call, Abu

Khadija told Harun to inform el Hage about al Tayyib's arrest so that el Hage could "take

precautions."  See GX 223A-T.  Demonstrating how concerned al Qaeda was over the potential

---

[12]      In this letter, Harun used el Hage's alias, "Abdel Sabbour," to refer to el Hage.

consequences of al Tayyib's arrest, Abu Khadija asked Harun whether his telephone was tapped.
See GX 223A-T ("How is your telephone? Do I get a headache if I use it?").  Al Qaeda's
membership was particularly concerned about the impact al Tayyib's cooperation would have on
the Nairobi cell, see GX 223A-T ("The boss wouldn't have any troubles but we would."), and the
possibility that al Tayyib might be cooperating with their enemy, the United States.  GX 223A-T.

El Hage's importance to the group, and the implications to him and the group
from al Tayyib's arrest, were most clearly laid out in the "Harun Security Report," which Harun
wrote on el Hage's computer.  See GX 300A-T.  The report laid out the results of Harun's
investigation for the al Qaeda leadership and proposed certain precautionary measures, advising
the group to "think and work based upon the movements of the damn enemy who is working day
and night trying to catch one of us or to get complete information about us."  Id.  Harun advised
in the Security Report that one of the precautionary measures he took was to collect el Hage's
files "which might pose a danger to us" and "place[ ] them in another location."  GX 300A-T.  In
fact, Harun moved el Hage's files to the Nairobi offices of MIRA, to await el Hage's return from
Afghanistan so el Hage could decide how to dispose of them.  GX 300A-T.

The eventual search by law enforcement of el Hage's files at MIRA revealed that
el Hage also furthered al Qaeda's agenda by arranging for fake passports and other travel
documents on behalf of al Qaeda operatives.  El Hage's files included various tools of the fake
passport trade, including a recipe for making a fake passport by changing certain photographs
and using certain seals, see GX 624J, entry and exit stamps from Kenya and Yemen, see
GX 300E, 300F, 300G, 300H, 300I, as well as passport photos, passports, and immigration
stickers, see GX 604 (a series of passport-sized photographs of individuals identified as al Qaeda

17

members, including Anas al Liby, the al Qaeda member who, in 1994, conducted surveillance in

the vicinity of the U.S. Embassy in Nairobi); GX 623 (passport of "Mohamed Shehata");

GX 625B (a series of passport photographs); GX 631 (passport of "Ahmed al Shalif"); GX 633

(a series of passport photographs); GX 634 (Kenyan visa stamp)).

A search of a computer seized from el Hage's Nairobi residence also yielded a

computer that contained a program for manipulating images so they could be placed onto travel

documents.  See Tr. 1767-68, 1773-74.

### E.   El Hage Returns to the United States After Being Confronted by U.S. Law Enforcement

On August 21, 1997, Kenyan and United States officials searched el Hage's

residence in Nairobi.  See Tr. 1078-79. Seized items included a laptop computer, from which a

deleted file containing the Harun Security Report was recovered; address books, which included

coded references to telephones used by Atef, the al Qaeda military commander, and Ali

Mohamed, al Qaeda's terrorist training expert; as well as computer diskettes, notebooks, a date

planner, and certain of el Hage's travel documents.  See Tr. 1080-88; GX 300, 304, 305, 306,

307, 308, 309, 310.

Later that day, el Hage was stopped at Kenyatta Airport in Nairobi upon his return

from visiting with al Qaeda's leadership in Afghanistan, see GX 300A-T, and his United States

passport and other travel documents were seized from him.  See Tr. 1102-03; GX 314, 315, 316,

317.  During that meeting, representatives of the U.S. government informed el Hage that there

was no specific information indicating that el Hage and his family were in danger, but that

analysis of recent events indicated that el Hage (and his family) were potentially in danger and

18

that this was an opportunity for el Hage to help himself and his family out of a predicament.  See

Def. Ex. 6 (05/22/200 letter from AUSA Fitzgerald).  In the course of that interview, el Hage

feigned a willingness to cooperate with U.S. authorities in their investigation, but falsely claimed

that he had not had contact with the Bin Laden organization since 1994.  See id.  Even when

directly confronted and told that the interviewing agents did not believe him, el Hage simply

stated that he had a lot to think about and asked for a couple of days to think about what had been

discussed.  See id. at 2.

> Thereafter, el Hage, a naturalized citizen, left Kenya and moved to the United

States, settling in Arlington, Texas.

### F.      El Hage's Initial Lies to the Grand Jury

> El Hage appeared twice before a grand jury sitting in the Southern District of New

York investigating Bin Laden and al Qaeda.  Both times, El Hage lied.  He lied not only to

protect himself, but to further al Qaeda's terrorist, anti-American agenda.

> The first appearance was on September 24 1997, after Bin Laden had publicly

declared war on the American military    see, e.g., GX 1600-T (August 1996 fatwah), GX 300A-

T (indicating that the "East Africa crew" had received news of al Qaeda's declaration of war

against the United States), GX 80-T (Bin Laden interview with CNN)    but prior to the Embassy

bombings.  During his testimony, el Hage repeatedly lied to the grand jury in an effort to protect

al Qaeda and to conceal the group's terrorist agenda and future plans.  Despite having attended al

Qaeda meetings at which al Qaeda's radical agenda was discussed in the early 1990s, el Hage

claimed ignorance of al Qaeda's purpose after the Soviets left Afghanistan.  Despite having

himself received and delivered Bin Laden's message to militarize the Nairobi cell in February

1997, el Hage insisted that it was not until May 1997, when CNN aired its interview of Bin

Laden, that he became aware of al Qaeda's intention to target the United States.  See, e.g.,

Tr. 807-10, 824-25, 850, 961; GX 310-73A-T, 310-74A-T.  Despite having been dispatched to

Lake Victoria to investigate al Banshiri's death and its implications for al Qaeda's secrets, see

supra, el Hage feigned ignorance and suggested that al Banshiri was still living in Sudan or

Afghanistan.  See Tr. 831.  And despite his meetings with Bin Laden in Afghanistan and

telephone calls via the satellite phone, see supra, el Hage claimed that he had not seen Bin Laden

in person since 1994 and had spoken with him by telephone only once shortly after that last

meeting, and then only to discuss spare parts for tractors.  See Tr. 780-81, 838-39, 885-86.

Despite repeated opportunities, el Hage declined to assist U.S. law enforcement in

identifying al Qaeda members in the Sudan, Afghanistan, and Kenya.  Thus, in the months before

the Embassy bombings, el Hage actively concealed not only his own involvement with al Qaeda,

but also the identities and locations of his co-conspirators.  This allowed them to continue to

work towards their murderous goals free from the scrutiny of U.S. law enforcement.  To that end,

when he testified before the Grand Jury in September 1997, el Hage's testimony was replete with

lies designed to guard al Qaeda's secrets while distancing himself   in the eyes of U.S. law

enforcement   from his co-conspirators who actively were preparing to attack U.S. interests

abroad.

### G.    Bin Laden's 1998 Directive to Kill American Civilians and Military Alike

Thereafter, in February 1998, Bin Laden issued another public fatwah directing

Muslims to kill American civilians wherever they might be found.  See PSR ¶ 80; GX 93-T

(translation of 1998 fatwah).  In May 1998, Bin Laden emphasized the point, instructing his

followers "not [to] differentiate between those dressed in military uniforms and civilians; they are all targets in this fatwah."  See PSR ¶¶ 83-84; GX 81 (Bin Laden interview).

In spite of this clear statement of intent to bring its terrorist activities to civilians, el Hage continued to maintain his silence about al Qaeda and its operations.  By hiding in plain sight, and limiting his communications with his co-conspirators, el Hage intentionally imparied law enforcement's ability to learn of al Qaeda's designs.

### H.     The Bombings

On August 7, 1998, the conspiracies' objectives were realized.  At approximately 10:30 a.m., a truck bomb exploded at the United States Embassy in Nairobi, killing 213 people.  See PSR ¶ 111.  Then, at approximately 10:40 a.m., the United States Embassy in Dar es Salaam was destroyed by another truck bomb, killing 11 people.  See PSR ¶ 114.  The death toll at the Tanzanian Embassy was 11 people.  Id.  Each of the Embassies was destroyed by trucks carrying TNT.  See, e.g., GX 1462 (laboratory results indicating presence of TNT in swabs recovered from the Embassy in Tanzania); GX 844 (laboratory results indicating presence of TNT in the swab recovered from the Embassy in Kenya).

### I.     El Hage's Continued Lies to U.S. Law Enforcement

In the wake of the Embassy bombings, el Hage continued to deceive U.S. law enforcement and lied to protect the identities and locations of his co-conspirators.  First, on August 20, 1998, el Hage repeatedly made false statements to the FBI regarding the nature of his contacts with al Qaeda.  See PSR ¶ 143.  El Hage falsely claimed that he did not know Mohamed Sadeek Odeh, and persisted in his false claims that he had broken all contact with al Qaeda in 1994.  Id.

On September 16, 1998, el Hage appeared before that grand jury for a second time.  Once again, el Hage repeatedly lied about himself and others involved in al Qaeda's terrorist agenda.  See Tr. 3151-55; GX 420A.  While testifying under oath, el Hage continued to falsely deny contact with Bin Laden since 1994.  See Tr. 3167-70, 3194; GX 219A, 222A, 400 at 158.  Despite his presence at the weekly meetings in Bin Laden's Sudanese guesthouses in the early 1990s, el Hage continued to deny having known of al Qaeda's intention to attack the United States prior to Bin Laden's 1997 CNN interview.  See Tr. 3194. And despite evidence to the contrary, El Hage also concealed the identity and role of those involved in the Embassy bombings by claiming not to know or recognize photographs of various al Qaeda members who were involved in the bombings.  See Tr. 1278, 3159-60, 3215-21, 3263-64; GX 424, 614.

El Hage's lies to U.S. authorities   both in 1997 and 1998   furthered the conspiracies by obstructing the investigation into al Qaeda's terrorist activities and hindering the United States' efforts to identify and apprehend the murderous group of extremists who were conspiring against it.

## II.   THE SENTENCING GUIDELINES CALL FOR LIFE IMPRISONMENT

The Embassy bombings were an extraordinary act of mass murder, and, as described above, the defendant played a central role in the conspiracies that culminated in the murder of 224 innocent victims on August 7, 1998. Given the scale of the crime, and the defendant's active participation in it, the Guidelines call for a sentence of life imprisonment.

### A.   The Probation Office's Calculation

In light of the facts set out above and in the Presentence Report, the Probation Office calculated the applicable Sentencing Guidelines range.

To do so, the Probation Office first determined that the Sentencing Guideline for Counts One and Three is found at U.S.S.G. § 2A1.5.  See PSR ¶¶ 173, 174.  Because the offense resulted in the death of a victim (indeed, the deaths of 224 victims), U.S.S.G. § 2A.1.5 cross references Section 2A1.1. Id.  Section 2A1.1 of the Guidelines implies a base offense level of 43. Id.

The Sentencing Guideline for Count Five is found in Section 2X1.1.  See PSR ¶ 175.  Because the conspiracy is covered by another Guideline section, pursuant to Section 2X1.1(c)(1), Guideline Section 2K1.4 is applied to Count Five.  Id.  But Section 2K1.4(a)(1) notes that if "the offense was intended to cause death or serious bodily injury, [the Court should] apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above [in Section 2K1.4(a)]."  U.S.S.G. § 2K1.4(c)(1).  The base offense level for first degree murder, 43, is higher than the base offense level of 24 that is set out in Section 2K1.4(a).  Because the offense resulted in death, the Probation Office determined that Section 2A1.1 also applied to Count Five, establishing a base offense level of 43.   See PSR ¶ 175.

With respect to Counts 287 through 289 (perjury), and Counts 291 through 305 (perjury and false statements), the Probation Office concluded that those counts were grouped together pursuant to U.S.S.G. § 3D1.2(b) because "the false testimony served as two or more transactions connected by a common criminal objective."  PSR ¶ 172.  Moreover, because el Hage was convicted of both the perjury counts and the offenses with respect to which the obstructive conduct occurred, the Probation Office concluded that they should be grouped together with Counts One, Three, and Five pursuant to U.S.S.G. § 3D1.2(c).  PSR ¶ 172.  As

such, pursuant to U.S.S.G. § 3C1.1, these counts increase the offense levels for Counts One, Three, and Five by two levels, pursuant to U.S.S.G. § 3C1.1.

Accordingly, the Probation Office analyzed Chapter Two, Part A (Offenses Against the Person)   and determined that "the guideline for First Degree Murder is the most analogous guideline."  PSR ¶ 176.  See PSR ¶ 176 (citing U.S.S.G. § 2A1.1(a)).  Therefore, the Probation Office concluded that 43 is the governing base offense level here.  See PSR ¶ 176 (citing U.S.S.G. § 2A1.1(a)).

Because the offense involved the intentional selection of both victims and property based on national origin, the Probation Office increased the base offense level by three levels   from the base offense level of 43, to 46.  PSR ¶ 177 (citing U.S.S.G. § 3A1.1(a)). Similarly, because the victims of the defendant's bombing conspiracy included Government officers and employees, and the offense of conviction was motivated by this status, the Probation Office determined that a further three-level increase was warranted, which raised the adjusted offense level to 49.  See PSR ¶ 178 (citing U.S.S.G. § 3A1.2(a)).[13]

Moreover, because the bombing conspiracy was a felony that involved and was intended to promote a federal crime of terrorism, see U.S.S.G. § 3A1.4(a), the Probation Office determined that the adjusted offense level of 49 was to be increased by a further twelve levels, to 61.  See PSR ¶ 179 (citing U.S.S.G. § 3A1.4(a)).

Further, based on its conclusion that el Hage functioned as a manager or supervisor of criminal activity during the course of the conspiracies, the Probation Office

_____

[13]     The Probation Office used the 1997 edition of the Guidelines, see PSR ¶ 174, and neither party has objected.  In the November 1, 2004 edition, the United States Sentencing Commission increased the three-level official victims enhancement to the present six-level enhancement.  See U.S.S.G. § 3A1.2(b) (November 1, 2010).

determined that a further three-level increase was appropriate pursuant to U.S.S.G. § 3B1.1(b),

raising the adjusted offense level to 64.  PSR ¶ 180.

   Finally, as noted <u>supra</u>, because el Hage obstructed justice by providing false

testimony during two Grand Jury proceedings, the Probation Office applied a two-level increase

pursuant to U.S.S.G. § 3C1.1, bringing the adjusted offense level to 66.  PSR ¶ 66.

   As the defendant is not entitled to any downward adjustment for acceptance of

responsibility, <u>see</u> PSR ¶ 183, the Probation Office concluded that the total offense level is 66.

<u>See</u> PSR ¶ 184.

   Given this offense level, and the defendant's Criminal History Category of VI,[14]

<u>see</u> PSR ¶ 189 (citing U.S.S.G. § 3A1.4(b)), the Probation Office properly concluded that the

defendant's Sentencing Guidelines range is a term of imprisonment of life.  <u>See</u> PSR ¶ 248.[15]

---

[14]  The defendant also objects to his placement in Criminal History Category VI,
pursuant to U.S.S.G. § 3A1.4(b).  <u>See</u> Def. Oct. Mem. at 48-50.  Specifically, el Hage argues that
a Criminal History Category of VI "constitutes a gross overstatement of his criminal history since
he does not have any prior convictions, either in the United States or abroad."  <u>Id.</u> at 48.  But that
is not the standard.  The Court of Appeals has recognized that "the Sentencing Commission had a
rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.]
§ 3A1.4(b), because even terrorists with no prior criminal history are unique among criminals in
the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."
<u>United States</u> v. <u>Meskini</u>, 319 F.3d 88, 92 (2d Cir. 2003).  Notwithstanding that, if the sentencing
court determines that Section 3A1.4(b) over-represents "the seriousness of the defendant's past
criminal conduct or the likelihood that the defendant will commit other crimes," it retains the
discretion to depart downward and/or vary pursuant to Section 3553(a).  <u>Id.</u>  The Government
respectfully submits that neither of those factors is present here.  As described <u>supra</u>, the
defendant's participation in these conspiracies, and the senir role he occupied within al Qaeda
establish that el Hage is exactly the type of terrorist that this enhancement is designed to punish
and incapacitate.

[15]  Under the Guidelines, 43 is the highest possible offense level and, in the final
analysis, "an offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G.,
Chapter Five, Pt. A, app. note 2.  The Probation Office also recommended restitution in the
amount of $33,816,561, <u>see</u> PSR ¶ 261, which the defendant does not contest; $7,516,561.75 of
this amount represents restitution to the surviving relatives of deceased victims.  <u>See id.</u>  In light

**B.**     **El Hage's Objections to the Probation Office's Guidelines Calculation**

At the 2001 sentencing, the defendant objected to several of the enhancements, including the use of Section 2A1.1 to establish the base offense level and the three-level enhancement for functioning as a manager or supervisor under Section 3B1.1(b).  See Def. Oct. Mem. at 9.  Judge Sand, however, denied the defendant's objections and adopted the findings of the Presentence Report.  See Ex B (10/18/2001 Tr.) at 121.  After denying the defendant's applications for downward departures, Judge Sand imposed a sentence of life imprisonment.  See Ex B (10/18/2001 Tr.) at 149.

On appeal, the Second Circuit affirmed Judge Sand's factual findings and Guidelines calculations in all respects.  See In re Terrorist Bombings, 552 F.3d at 151-56.

Recognizing that his prior "objections [to the Guidelines calculations] were rejected by both Judge Sand and the Second Circuit," the defendant initially conceded in his October Memorandum that "they will not be presented herein as Guidelines issues" at his re-sentencing.  Def. Oct. Mem. at 9.  Notwithstanding that, "in order to preserve them should there be any intervening change in law subsequent to re-sentencing," the defendant affirmatively re-asserted those claims in his October submission.  Id.

In his March Memorandum, however, the defendant has completely reversed course with respect to his position regarding the application of the Guidelines at re-sentencing.  See Def. Mar. Mem. at 46-49.  Relying upon the Second Circuit's recent decision in United States v. Desnoyers, 708 F.3d 378 (2d Cir. 2013), el Hage contends that he is entitled to challenge the imposition of a 15-point enhancement pursuant to U.S.S.G. § 2A1.5(c)(1) and the

---

of the restitution amount, the Probation Office does not recommend a further fine.  See PSR at 86.

three-point role in the offense adjustment pursuant to U.S.S.G. § 3B1.1(b).  In short, el Hage contends that based upon a single piece of hearsay evidence   the so-called Harun Autobiography   Judge Sand's rulings on those enhancements, and the Court of Appeals affirmance of those rulings, "have been sufficiently undermined by the subsequent information that they no longer apply to Mr. El-Hage."  Def. Mar. Mem. at 46.  The defendant's argument fails both as a matter of law and as a matter of fact, and therefore should be rejected by the Court.

Before addressing the defendant's argument, one point bears brief mention here. The Probation Office determined that the Sentencing Guidelines offense level is 66, see supra, and, as noted, the defendant objects to this Guidelines calculation only to the extent that the Probation Office applied a 15-level increase pursuant to U.S.S.G. § 2A1.1, and a further three-level increase pursuant to U.S.S.G. § 3B1.1(b).  Therefore, even if the defendant successfully convinced the Court that those enhancements should not apply, the defendant's offense level will still be 48   an offense level that is well above the level (43) that calls for the imposition of a life sentence.  Accordingly, the defendant essentially has conceded that the Sentencing Guidelines call for a sentence of life imprisonment.

### 1.    The Defendant's Reliance on Desnoyers Is Misplaced

As an initial matter, this case is before the Court for re-sentencing pursuant to the November 24, 2008 mandate issued by the Court of Appeals ("Mandate").  In the Mandate, the Second Circuit remanded this matter "for the sole purpose of resentencing El-Hage in accordance with the opinion of this Court."  See Ex D (Docket Entry No. 744).  In the opinion that issued on the same day as the Mandate, In re Terrorist Bombings, the Court of Appeals specifically "reject[ed] all of El-Hage's challenges to the District Court's calculation of his Guidelines

range."  552 F.3d 93, 153-54.  Notwithstanding that, the Court of Appeals "vacate[d] El-Hage's sentence because it resulted from the mandatory application of the Guidelines," and "therefore remand[ed] his case for sentencing pursuant to United States v. Fagans, 406 F.3d 138 (2d Cir. 2005)."  Id. at 154.

The Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), significantly altered the federal sentencing landscape by rendering the United States Sentencing Guidelines advisory.  See Booker, 543 U.S. at 245-46.  In the aftermath of Booker, the Second Circuit issued its decision in United States v. Crosby, 397 F. 3d 103 (2d Cir. 2005), which held that the appropriate remedy for a defendant who was sentenced under the mandatory Sentencing Guidelines regime, and whose case was pending on direct appeal as of the date that Booker was decided, was a remand to the district court, "not for the purpose of a required resentencing, but only for the more limited purpose" of determining whether a re-sentencing proceeding was required.  Crosby, 397 F.3d at 117; see id. at 120.  As the Court of Appeals held in United States v. Fagans, 406 F.3d 138, 142 (2d Cir. 2005), however, where a Booker claim was preserved by a timely objection, the limited remand under Crosby is not appropriate.  Rather, under Fagans, the proper remedy for a preserved claim of error under Booker is a remand for resentencing, absent a showing of harmlessness by the Government.  See United States v. Lake, 419 F.3d 111, 113 n.2 (2d Cir. 2005).

Re-sentencing, however, is not necessarily conducted in a vacuum.  The "law of the case" doctrine "ordinarily will bar a defendant from renewing challenges to rulings made by the sentencing court that were adjudicated by this Court     or that could have been adjudicated by [this Court] had the defendant made them     during the initial appeal that led to" the remand.

28

United States v. Williams, 475 F.3d 468, 475 (2d Cir. 2007); see also Burrell v. United States,
467 F.3d 160, 165 (2d Cir. 2006) ("'where issues have been explicitly or implicitly decided on
appeal, the district court is obliged, on remand, to follow the decision of the appellate court'")
(quoting United States v. Minicone, 994 F.2d 86, 89 (2d Cir. 1993)); United States v. Ben Zvi,
242 F.3d 89, 95 (2d Cir. 2001) ("The mandate rule [which is a "subsidiary rule[]" of the law of
the case doctrine] compels compliance on remand with the dictates of the superior court and
forecloses relitigation of issues expressly or impliedly decided by the appellate court." (citations
and internal quotation marks omitted; emphasis in original)).  "In other words, the trial court is
barred from reconsidering or modifying any of its prior decisions that have been ruled on by the
court of appeals." Minicone, 994 F.2d at 89 (internal citation and quotation marks omitted).

     "When an appellate court has once decided an issue, the trial court, at a later stage
in the litigation, is under a duty to follow the appellate court's ruling on that issue." United States
v. Cirami, 563 F.2d 26, 32 (2d Cir.1977).  "To determine whether an issue remains open for
reconsideration on remand, the trial court should look to both the specific dictates of the remand
order as well as the broader 'spirit of the mandate.'" Ben Zvi, 242 F.3d at 95; see Burrell, 467
F.3d at 165.

     Here, the defendant's reliance on United States v. Desnoyers for his claim that
sentencing should proceed de novo is misplaced.  Indeed, the portions of Desnoyers cited by the
defendant stand for the unremarkable proposition that following vacatur of a conviction, re-
sentencing should proceed de novo.  In the sentencing context, however, the Court of Appeals
has held that "'[t]he nature of the issues for resolution in the district court on a remand from the
court of appeals depends principally on the issues that had been presented in the appeal and the

29

directions given by the court of appeals in ordering further proceedings.'" Burrell (quoting

United States v. Barresi, 361 F.3d 666, 672 (2d Cir.2004)).  As the Burrell panel further

explained:

> We have stated that a "resentencing usually should be de novo when a Court of
> Appeals reverses one or more convictions and remands for resentencing" or
> otherwise "effectively undoes the entire 'knot of calculation'" under the
> Sentencing Guidelines.  United States v. Quintieri, 306 F.3d 1217, 1228 (2d
> Cir.2002).  On the other hand, "absent explicit language in the mandate to the
> contrary, resentencing should be limited when the Court of Appeals upholds the
> underlying convictions but determines that a sentence has been erroneously
> imposed and remands to correct that error."  Id. This rule that the district court's
> authority on remand is limited to those issues left open by the mandate is a firm
> one and rigidly binds the district court.  See id. at 1225.

Burrell, 467 F.3d at 165 (emphasis in original).

As such, Desnoyers does not support the defendant's argument here.

## 2.    The Harun Autobiography Does Not Provide a Compelling Reason to Revisit Judge Sand's Guidelines Calculations

The Court of Appeals has recognized three principal exceptions to the limitations

on a Fagans remand.  See United States v. Quintieri, 306 F.3d 1217, 1229.  First, the Court

explained that "there may be circumstances in which the 'spirit of the mandate' requires de novo

sentencing, for example when the reversal effectively undoes the entire 'knot of calculation.'"

Quintieri, 306 F.3d 1217, 1228 (2d Cir. 2002); see also id. at 1229 n.6 (if correction of

sentencing errors "would undo the sentencing calculation as a whole," de novo resentencing is

permissible).  This prong of Quinteri is clearly inapplicable here as the Mandate merely requires

this Court to consider sentencing the defendant under a non-mandatory Guidelines regime and

does not impact the Guidelines calculation in any way.

Second, "[a]n issue is not considered waived . . . if a party did not, at the time of

the purported waiver, have both an opportunity and an incentive to raise it before the sentencing

court or on appeal." Quintieri, 306 F.3d at 1229.  In other words, if an issue "had no practical

effect on a defendant's sentence at the original sentencing but becomes relevant only after

appellate review, a defendant is free to challenge that sentencing determination on remand, and

ultimately on reappeal, despite the failure to challenge that determination initially." Id. at

1229-30 (citation omitted).

   The defendant erroneously cites to this second prong of Quintieri to support his

argument.  See Def. Mar. Mem. at 49.  Put simply, this prong does not apply on the facts of this

case.  The defendant not only had the opportunity to challenge, but did vehemently challenge the

application of each of these Guidelines.  With respect to the 15-point enhancement, the defendant

contended that he both withdrew from the conspiracy prior to the bombings and that he had no

knowledge of the bombings themselves.  See Ex E (10/11/2001 Sentencing Submission) at 2-11.

In advancing that argument to Judge Sand, el Hage made arguments identical to those set forth in

his October Memorandum and cited to identical evidence.  Compare Ex E (10/11/2001

Sentencing Submission) at 2-11 with Def. Oct. Mem. at 27-39.  The same is true of the

defendant's objections to the applicability of the leadership enhancement.  See Ex E (10/11/2001

Sentencing Submission) at 12-13.  The only difference between the arguments he advanced in

2001, and the arguments he presently is advancing, is that the defendant now cites to portions of

the Harun Autobiography to support those claims.

   Finally, "even if an issue is barred by law of the case, appellate courts may depart

from the law of the case and reconsider the issue for 'cogent' and 'compelling' reasons such as

'an intervening change of controlling law, the availability of new evidence, or the need to correct

a clear error or prevent manifest injustice.'"  Quintieri, 306 F.3d at 1230 (quoting United States

v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000)).

　　　　　This is the only prong of Quintieri that arguably could apply.  For the reasons set

forth below, however, the Harun Autobiography does not consist of the type of "new evidence"

that creates a "compelling" reason for this Court to depart from the law of the case or alter Judge

Sand's Guidelines determinations.  This is because the Harun Autobiography thoroughly

inculpates el Hage, and the limited portions to which the defendant cites would not alter Judge

Sand's previous findings.

> **a.**　　**The Application of the 15-Level Enhancement Pursuant to U.S.S.G. § 2A1.1 Would Be Appropriate Even If the Harun Autobiography Is Considered**

> > **i.**　　**The Evidence Establishes That El Hage Did Not "Withdraw" from the Conspiracy**

　　　　　As he did at the 2001 sentencing, and again on appeal, El Hage argues that the 15-

level enhancement of Section 2A1.1 should not apply because he "effectively withdrew" from

the conspiracies when he returned to the United States in September 1997.  See Def. Oct. Mem.

at 25-39.  This issue was hotly contested throughout the sentencing proceeding, although the

defendant did not raise it on appeal.  See Ex F (10/16/2001 Government Sentencing Letter) at 2-

5.

　　　　　At trial, el Hage elected to forego any claim that he withdrew from the

conspiracies, see Tr. 4589, and instead chose to argue that he never was a member of those

conspiracies.  Following his conviction, el Hage raised the withdrawal argument for the first time

at sentencing.  Specifically, el Hage cited the following facts: (i) his return to the United States in

32

September 1997; (ii) information that al Qaeda members went to Nairobi to look for el Hage and that U.S. authorities warned el Hage that he may be in danger; and (iii) Ali Mohamed's grand jury testimony that he believed el Hage had disassociated himself with al Qaeda.  The Government disputed that el Hage had withdrawn from the conspiracies in 1997, and cited to several facts contained in the record that undercut el Hage's claims.  See Ex G (10/15/2001 Government Sentencing Letter) at 2-3.

Following extensive briefing and oral argument, Judge Sand rejected el Hage's claim of withdrawal:

> [T]he Court finds, both legally and factually, there is no merit in the claim that El Hage withdrew from the conspiracy and withdrew from the conspiracy prior to the embassy bombings....I understand now counsel's argument relates not to guilt but to sentencing, and the claim which I find to lack merit is that Mr. El Hage coming to America and his conduct in America constitutes a withdrawal.  El Hage relies on some statements made to others said to be involved in the activity of the conspiracy, but those statements are at best ambiguous and are not particularly persuasive.  What is persuasive is that on two occasions after he returned to America, El Hage, given the opportunity to evidence his withdrawal, to the contrary, engaged in blatant perjury, as the jury has found.  But that perjury is not simply a denial of events relating to an already consummated conspiracy, but is perjury designed to thwart the investigation into the activities of the ongoing conspiracy.

Ex A (10/17/2001 Tr.) at 36.

Nothing in the Harun Autobiography alters this conclusion.  Even if the Court were to consider the Harun Autobiography in the piecemeal, exaggerated fashion that the defense proposes, it establishes only that el Hage's direct subordinate, Harun, had growing concerns about el Hage's focus and his adherence to al Qaeda's strict security measures.  See, e.g., Def Mar. Mem. at 11 (quoting portion of Harun Autobiography in which Harun expressed concern that el Hage was "in danger, because he was involved in business trading activities and forgot the

33

organization"). Indeed, certain of the passages cited by the defendant establish that he continued to be a member of the organization, albeit a reckless one by Harun's standards. See, e.g., id. at 12 (describing how "Wadih was dealing with precious stones," and Harun advised el Hage "to stop the trading because it will expose our real activities, but Wadih used to say that the brothers do not support us with our daily life expenses, and he needed to trade in order to make a living.").

       As such, these limited portions of the Harun Autobiography in which Harun expresses frustration with decisions made by his direct superior – el Hage – cannot support a withdrawal defense. Nor do they undermine Judge Sand's previous finding that el Hage did not withdraw from the conspiracy. Because "a conspirator is presumed to continue in the conspiracy until the last act of any of the conspirators," United States v. Menendez, 612 F.2d 51, 54 (2d Cir. 1979), a defendant must meet "rigorous requirements" to make out the defense of withdrawal. United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1965). In this regard, a "cessation of activity is insufficient, standing alone, to prove withdrawal." (Def. Br. at 26.) See, e.g., United States v. Eisen, 974 F.2d 246, 268 (2d Cir. 1992). A defendant must also show that he performed "some act that affirmatively established that he disavowed his criminal association with the conspiracy," id. (internal quotation marks omitted), "'either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators,'" United States v. Berger, 224 F.3d 117, 118 (2d Cir. 2000). Also, "the defendant must not take any subsequent acts to promote the conspiracy" or "receive any additional benefits from the conspiracy." Id. The disclosures in the Harun Autobiography cannot carry this burden.

       Moreover, other portions of the Harun Autobiography clearly establish that el

34

Hage continued to be an active member of al Qaeda, in spite of Harun's concerns.  For example, in one portion, Harun notes that he (Harun) engaged in covert activities on behalf of al Qaeda "because we did not want[el Hage] to appear doing these type of secret work, in order for us to maintain a good reputation for the organization."  Def. Mar. Mem. at 14.  Similarly, as his concerns about el Hage's safety increase, Harun indicated that "[w]e also decided to write another report to the leadership requesting moving Wadih from Kenya for security reasons."  Id. at 13.

As such, the Harun Autobiography provides no support for el Hage's claim that he withdrew from the conspiracies of which he was convicted.  Nor does it undercut any of the evidence upon which Judge Sand relied in concluding that el Hage did not withdraw.  Thus, there is no "new evidence" that would justify reconsideration of the applicability of the 15-level enhancement pursuant to U.S.S.G. § 2A1.1.  See Quintieri, 306 F.3d at 1230.

### ii.    There Is No Requirement That Deaths Be Foreseeable to Apply the 15-Level Enhancement

The defendant further argues that a 15-level enhancement is inappropriate because "Mr. El-Hage left Kenya in September 1997, prior to commencement of the preparation for the Embassy bombings, and was not privy to those plans."  Def. Mar. Mem. at 16.  Even if that were true, it would be of no moment in determining whether to apply the 15-level enhancement here.  As the Court of Appeals held in this case:

> Assuming arguendo the accuracy of El-Hage's characterization of the record, we find no merit in his challenge to the base offense level determined by the District Court.  Pursuant to § 2A1.5, the offense of conspiracy to commit murder entails a base offense level of 28 unless "the offense resulted in the death of a victim," in which case the offense level of 43 set forth in § 2A1.1 applies.  Because the jury convicted El-Hage of multiple counts of conspiracy to commit murder, and also

35

> found that over two hundred deaths resulted from these murder conspiracies, the
> jury's findings show that El-Hage was a member of a conspiracy that resulted in at
> least one death.  The Guidelines require no additional measure of responsibility or
> awareness.  It is plain, therefore, that a base level of 43, which corresponds to a
> murder conspiracy that results in at least one death, governs the conduct at issue
> here.

In re Terrorist Bombings, 552 F.3d at 152 (emphasis added).

Accordingly, irrespective of the disclosures in the Harun Autobiography, the

Second Circuit's ruling forecloses any further litigation of this point.

> **b.      The Application of the 3-Level Enhancement Pursuant to
>          U.S.S.G. § 3B1.1(b) Would Be Appropriate Even If the Harun
>          Autobiography Is Considered**

Consistent with his position at the 2001 sentencing, the defendant continues to

argue that because he was not the leader of al Qaeda's East Africa cell, the three-level

enhancement pursuant to U.S.S.G. § 3B1.1(b) is inappropriate.  See Def. Oct. Mem. at 39-41;

Def. Mar. Mem. at 7.  In support of that argument, el Hage points to evidence indicating that

other members of al Qaeda occupied roles senior to him, including some of the individuals

present in Kenya at the time that el Hage was in charge of administering al Qaeda's Nairobi cell.

To that end, the defendant contends that the Harun Autobiography demonstrated that el Hage

"served a subordinate administrative function that was separated geographically and functionally

from al Qaeda's plans and operations."  Def. Mar. Mem. at 7.

As it was in 2001, this argument is nothing more than a distraction from the facts

proven at trial.  As Judge Sand noted in rejecting this same claim, "the government is not

contending that [el Hage] was at the highest level, but he certainly was at a level higher than

somebody whose job was to grind the explosive and was regarded as expendable."  See Ex A

(10/17/2001 Tr.) at 49.  Indeed, as Judge Sand further explained, a role enhancement was

appropriate because the defendant was "somebody who had managerial responsibility."  Id. at 53.

Judge sand further clarified: "I don't think the government claims that he was a member of the

highest counsel of the conspiracy, but he certainly wasn't a flunky or a gofer. . . . [A]nybody who

goes and says I am the authorized spokesman for Bin Laden and this is what the objectives are

for the Kenyan cell is somebody who I believe meets the requirement for the enhancement."  Id.

at 51.  More pointedly, the Harun Autobiography does not alter the conclusion from the other

evidence that the defendant was a trusted associate of al Qaeda who handled some of the most

sensitive issues on behalf of the group while headquartered in the Sudan.  See Tr. 259, 1276.

As the Court of Appeals concluded, the evidence adduced at trial, and presented at

sentencing, thoroughly supported Judge Sand's conclusion that el Hage was a manager or

supervisor.  See In re Terrorist Bombings, 552 F.3d at 155 (holding that role enhancement was

appropriate because record evidence established that the defendant: "(1) participated in private

meetings with Bin Laden," (2) was the "paymaster for Bin Laden's enterprises, (3) procured fake

travel documents, (4) served as the head of the Nairobi Al Qaeda cell, and (5) delivered messages

directly from Bin Laden").

The Harun Autobiography does nothing to alter those conclusions.  At best, the

Harun Autobiography establishes that there were other higher-ranking al Qaeda members who

overlapped with el Hage in Kenya.  For example, the first passage cited by the defendant relates

to a meeting held following the death of Abu Ubaidah al Banshiri, a meeting was held at which

Mustafa Fadhil was elected as the Emir.  See Def. Mar. Mem. at 8.

But this is nothing new.  The defendant argued this exact point (i.e., that Fadhil,

and not el Hage, succeeded al Banshiri as the head of the East Africa Cell) at the 2001

sentencing.  See Ex E (10/11/2001 Defense Sentencing Letter) at 12.  The Harun Autobiography

therefore cannot be considered "new evidence" on this point.

El Hage also highlights the fact that there came to be two Kenya locations    one in

Nairobi and one in Mombasa    for al Qaeda's Kenyan cell.  See Def. Mar. Mem. at 25.  It is

unclear, though, how this undercuts el Hage's position of authority within al Qaeda.  Even after

the purported split, Harun indicates that he, and other al Qaeda members stationed in Mombasa

(e.g., Mohamed Sadeek Odeh), still reported to el Hage.  See, e.g., Def. Mar. Mem. at 10.

Indeed, the Harun Security Report, see GX 300A-T, written in late 1997, indicates that Harun

remained el Hage's direct subordinate and describes the East Africa cell as awaiting el Hage's

return to figure out how to proceed.

Finally, other portions of the Harun autobiography establish that el Hage did, in

fact, have a supervisory role in al Qaeda's East Africa cell.  For example, at one point Harun

confirmed that el Hage would travel to Khartoum to meet with Usama Bin Laden, and further

highlighted el Hage's close ties with Abu Ubaidah al Banshiri, then one of the three highest

ranking members of al Qaeda.  See Harun Autobiography at 81.  In other portions of the Harun

Autobiography, Harun: (i) explains that he (Harun) was el Hage's personal secretary;

(ii) described el Hage as being "in charge of finance/administration of [the] East Africa cell";

(iii) noted that el Hage was "chosen to lead the charitable organization 'Help Africa People' in

order to coordinate between senior leadership and us"; and (iv) described how el Hage was also

asked to "maintain his position as a treasurer for the cell."  See Harun Autobiography at 91.

Elsewhere in the Harun Autobiography, Harun explains that "Wadih El Hage []

was the director of a charity organization in Nairobi," i.e., Help Africa People (see supra), and

that "the organization wanted [another al Qaeda member] to work on some new profitable

projects to support the cell in Eastern Africa to eliminate using funds from Khartoum."  To that

end, the Harun Autobiography recalls that "[t]he group bought a fishing boat and tasked Marawn

Al Philistini with operating it under Wadih's supervision."  Def. Mar. Mem. at 20.

      As such, even when the trial evidence is viewed in light of the disclosures in the

Harun Autobiography, there remains ample evidence to support the 3-level increase pursuant to

U.S.S.G. § 3B1.1(b).

*           *           *

      Accordingly, for the reasons previously stated by Judge Sand, as affirmed by the

Court of Appeals, the Government respectfully submits that the Court should deny the

defendant's objections and adopt the Probation Office's Guidelines calculations at the re-

sentencing hearing.

## III.   THE STATUTORY SENTENCING FACTORS CALL FOR A LIFE SENTENCE

      In Crosby, the Court of Appeals held that, after calculating the appropriate

Sentencing Guidelines range, see supra, the sentencing court should determine the appropriate

sentence based on the Section 3553(a) factors.  These factors are:

(1)      the nature and circumstances of the offense and the history
         and characteristics of the defendant;

(2)      the need for the sentence imposed

      (A)      to reflect the seriousness of the offense, to
            promote respect for the law, and to provide
            just punishment for the offense;

      (B)      to afford adequate deterrence to criminal
            conduct;

      (C)      to protect the public from further crimes of

39

the defendant;
(D)  to provide the defendant with needed
      educational or vocational training, medical
      care, or other correctional treatment in the
      most effective manner;
(3)  the kinds of sentences available;
(4)  the kinds of sentence and the sentencing range established
      [in the Sentencing Guidelines];
(5)  any pertinent policy statement [issued by the Sentencing
      Commission];
(6)  the need to avoid unwarranted sentence disparities among
      defendants with similar records who have been found guilty
      of similar conduct; and
(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Just as the Guidelines call for a sentence of life imprisonment, see supra, so too do

each of the relevant Section 3553(a) factors, see infra Part III.A, and the defendant's counter-

arguments are meritless.  See infra Part III.B, Part III.C.

A.    **Each of the Section 3553(a) Factors Weighs Heavily in Favor of a Life
       Sentence**

   1.   **The Nature and Circumstances of the Offense and the History and
        Characteristics of the Defendant Call for a Life Sentence**

The nature of the defendant's offense weighs strongly in favor of a life sentence,

as do his history and characteristics.  See 18 U.S.C. § 3553(a)(1).  The August 7, 1998 attack on

the United States Embassies in Kenya and Tanzania was almost unimaginable in its brutality.

Two-hundred and twenty-four people were murdered that day.  See GX 39R (stipulation re: 213

Kenyan victims); see GX 54 (stipulation re: 11 Tanzanian victims).

With respect to the impact that the Embassy bombings had on the victims and

their families, Your Honor knows firsthand the devastation that they caused.  See, e.g., Ex H

40

(Relevant Portions of Government's Sentencing Submission from United States v. Ghailani).
This Court has seen the videos of the aftermath, see GX 83A (video taken outside of the U.S.
Embassy in Kenya in the immediate aftermath of the bombing); GX 84 (video taken outside of
the U.S. Embassy in Tanzania in the immediate aftermath of the bombing), and has witnessed the
testimony and other evidence regarding the devastation and catastrophic loss of human life that
followed in their wake.   Your Honor also has heard from many of the victims themselves, and
read letters from dozens of other victims.   See, e.g., Ex I (2011 Ghailani Sentencing Transcript);
see also Ex J (victim letters).   As such, the unimaginable suffering and the astronomical cost in
human life that were the result of these conspiracies need not be reprised here.

        Against that backdrop, the defendant's participation in these conspiracies is all the
more deplorable.   For years, the defendant    a U.S. citizen    operated at the heart of al Qaeda and
interacted directly with its senior-most personnel.   The defendant witnessed firsthand how al
Qaeda transformed from an organization focused on expelling the Soviets from Afghanistan into
a terrorist group with designs on attacking the United States.   He heard Bin Laden preach his
hatred for Christians and Jews, and joined in Bin Laden's goal to drive Americans out of Muslim
lands by any means necessary.   El Hage continued to operate in al Qaeda's innermost circles,
even as the organization's rhetoric of hate focused more and more on the United States    as Bin
Laden exhorted al Qaeda members to "cut off the head of the snake," by attacking U.S. forces
and, if necessary, killing civilians.   El Hage remained undeterred by Bin Laden's calls to inflict
suffering on the United States    first, by directing his followers to murder U.S. soldiers, and later
by calling for them to kill any Americans, civilian and military alike wherever they may be
found.

41

In that role, the defendant operated in the shadows, and assisted other al Qaeda members in avoiding detection so that they could work to accomplish al Qaeda's murderous objectives.  El Hage was one of the leaders of al Qaeda's East Africa cell,[16] and in that position, he oversaw and facilitated the travel and operations of many of those who participated directly in the bombings   including Harun, Mustafa Fadhil, Mohamed Sadeek Odeh, Anas al Libi, and Abu Mohamed al Masri.  Using charitable organizations and seemingly legitimate businesses as fronts, el Hage ensured that these operatives remained undetected by law enforcement, and were provided for as they continued to scheme and plot.

During the period from 1994 until he was confronted by U.S. authorities in 1997, el Hage oversaw the transformation of al Qaeda's Nairobi cell from a waystation for traveling al Qaeda operatives, into a militarized terrorist cell.  He attended meetings with Bin Laden and Mohamed Atef and implemented their directives in Kenya.  Indeed, it was el Hage who delivered the directive from Bin Laden himself, instructing the members of the East Africa cell to militarize the cell.

The evidence at trial showed that el Hage's participation in these conspiracies was an essential component in laying the groundwork for the bombings of the U.S. embassies.  In the face of this evidence, in the face of the jury's verdicts, and in the face of the thousands of innocent victims al Qaeda has harmed, el Hage unpersuasively asserts that he should be entitled to leniency before this Court because he personally did not commit any act of violence, and

---

[16]    The defendant objects to his being characterized as "the leader" of al Qaeda's East Africa cell because other senior members   including Abu Ubaidah al Banshiri   were present at various times in Kenya at the same time as the defendant.  As described supra, however, the record contains ample facts establishing the defendant's position of authority within al Qaeda, and his role as one of the leaders of al Qaeda's East Africa cell.

because he left Kenya months before the bombings themselves.  See Def. Oct. Mem. at 15 ("The Government never alleged that Mr. El-Hage committed any violent or terrorist act against the United States or anyone else, or that he possessed knowledge of the 1998 Embassy bombings (which occurred a year after Mr. El-Hage had returned to the U.S. from Kenya).")

The facts adduced at trial established both substantial knowledge and meaningful participation on the part of el Hage that facilitated al Qaeda's goals, including the egregious acts of violence on August 7, 1998.  Despite el Hage's present attempt to distance himself from the organization, the years leading up to his arrest demonstrate a level of participation that plainly calls for a life sentences regardless of whether el Hage himself participated in the acts of violence.  Furthermore, el Hage's participation in al Qaeda was not borne of some unthinking impulse     a fit of spite or passion, or a momentary lapse of reason.  The defendant did not want for the important things in life     family, friends, livelihood, education.  Indeed, the defendant traveled to the United States, where he was educated, naturalized, and raised a family.  As the defendant himself admitted:

> As a Muslim who came to this country to go to college then got married then got my citizenship, all that is considered an agreement with the U.S. government (which is people and laws) to abide by the laws of this country in return for all the rights I get as an American citizen.  As a result of such agreement, the U.S. government trusted me to act as an American citizen.

PSR ¶ 166 (quoting a written statement from the defendant).

In spite of having enjoyed these benefits of citizenship, el Hage joined and rose to a senior position within an organization that was committed to inflicting harm on the United States and its citizens.  And he continued to work on behalf of al Qaeda even after Bin Laden made clear in 1992 that al Qaeda's enemy was the United States, even after Bin Laden publicly

43

issued his "Declaration of Jihad Against the United States" in August 1996, and even after Bin

Laden directed his followers to attack American soldiers in 1997.  Indeed, he did so voluntarily,

willingly, and with full knowledge of al Qaeda's core mission.

Nor did el Hage renounce al Qaeda's goals.  Indeed, he left Kenya only because

stopped by U.S. authorities at the Kenya airport as he returned from a meeting with Bin Laden in

August 1997.  El Hage did not return to the United States because he was disillusioned with Bin

Laden or with al Qaeda, or because he regretted his past conduct.  El Hage realized that the U.S.

authorities had him in their sights, and that his very presence in Kenya could subject other al

Qaeda members to their scrutiny.  His travel to the United States was in furtherance of the

conspiracy, as it permitted him to attract the attention of the United States Government that

otherwise might have been directed to other members of al Qaeda

In spite of his past decisions, the U.S. authorities again gave el Hage a choice.

They approached him and gave him the opportunity to cooperate.  But once again, el Hage chose

al Qaeda.  As then AUSA Patrick Fitzgerald stated at the 2001 sentencing:

> In September of 1997, before Mr. El Hage ever went to the grand jury, he was
> brought to the government's office with an agent and myself.  I recall quite
> clearly, the choice was put to him.  He was told then that he was involved with
> Usama Bin Laden and the government knew it, that he knew the secrets of Usama
> Bin Laden, that Usama Bin Laden would kill Americans, would kill men, women
> and children, and it was up to him as an American, as a father and as a Muslim to
> help stop that.  He was told that if he didn't cooperate, some day he might face
> jail.  He would be separated from the family he now claims he wishes he could be
> with and he does, but he chose terror and hatred over his family.  He chose to lie.
> He lied repeatedly.  He lied that day.  He lied in the grand jury.  And he even lied
> under oath after the bombings in August of 1998.

Ex B (10/18/2001 Tr.) at 148.

Any innocent implications of el Hage's return to the United States in September

44

1997 — mere weeks after returning from his second visit with Bin Laden in Afghanistan — are completely undercut by his lies to the FBI and his perjury before the Grand Jury. El Hage could have broken from the conspiracy at the Kenya airport, he could have broken from the conspiracy at any time after he returned to the United States. But he chose not to. He chose to use his U.S. citizenship to hide in plain sight. He chose to deceive and deprive the United States of critical information that potentially could have led to the apprehension of other al Qaeda members who ultimately executed the bombings. He chose al Qaeda over the United States and his family, and in so choosing, allowed his co-conspirators to execute their deadly plot on August 7, 1998.

**2.      A life Sentence Serves the Goals of Deterrence, Just Punishment, and Respect for the Law**

Section 3553(a)(2) directs the Court to consider: "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

The instant offenses are justly punished only with a life sentence. As discussed supra, el Hage is a United States citizen who knowingly and willfully joined al Qaeda despite its explicitly violent and anti-American agenda. As one of its senior members, el Hage had direct access to Bin Laden and Muhammad Atef — the individuals responsible for disseminating the 1998 directive to kill U.S. civilians and military alike wherever they may be found — and was a party to their private meetings during which plots against the United States were discussed. El

45

Hage persisted in associating himself with, and substantially aiding, al Qaeda and its operatives

for years, with full knowledge of the organization's violent, anti-American goals.  That alone is

sufficient to warrant a life sentence here.

Beyond this, however, the evidence plainly established that el Hage was a critical

member of the conspiracy that resulted in the Embassy bombings, even if he was not the

technician who built the lethal bombs.  As argued before the jury, every terrorist organization,

including al Qaeda, depends on people like el Hage to facilitate and coordinate the activities of

the group.  In this case, the evidence showed that el Hage provided critical services such as: the

transport of weapons and al Qaeda members; the preparation of fake travel documents; the

distribution of key messages and policies from al Qaeda leaders, such as Bin Laden and

Muhammad Atef; and the use of front organizations to conceal the terrorist activities of al Qaeda

members such as Harun, Mustafa Fadhil, and Odeh, all of whom emerged from their cover to

carry out the Embassy bombings.  And, of course, el Hage lied repeatedly and so effectively that

he obstructed the Government's ability to disrupt and disable the al Qaeda network that carried

out the bombings.  Thus, there is a clear connection between el Hage's criminal conduct and the

deaths that resulted from the conspiracies he was a part of through September 1998.

Finally, el Hage has demonstrated himself to be an individual who has no respect

for the law.  As noted above, the defendant lied repeatedly to U.S. law enforcement as they were

investigating Bin Laden's organization.  El Hage proceeded to compound those lies    and further

frustrate law enforcement's efforts to apprehend other members of al Qaeda before they could

inflict harm on U.S. nationals abroad    by twice perjuring himself in front of the Grand Jury.

Incredibly, the defendant now argues that "in providing accurate information to

46

the government with respect to the location of the records Harun had moved from Mr. El-Hage's office . . . [el Hage] was attempting to assist the government, and not conceal information from it, or obstruct its investigation." Def. Oct. Mem. at 52.  That argument is as ridiculous as it is endemic to the defendant's continued efforts to protest his innocence in the face of overwhelming evidence and a jury verdict of guilt.  Any assistance thereby provided was dwarfed by el Hage's efforts to protect his co-conspirators and their ongoing plots by lying to the FBI and the Grand Jury.  Indeed, the defendant's information in this regard likely was intended to convey the impression that he was assisting, while he continued to conceal important information.

Similarly, the defendant's disciplinary record while he has been incarcerated only underscores his willingness to flout the law.[17]  For example, between November 2000 and his initial sentencing in September 2001, the defendant was sanctioned by the Bureau of Prisons on no less than seven occasions, including charges for secreting a makeshift weapon found in his cell.  See PSR Addendum.  Following his initial sentencing, the defendant was sanctioned on no less than 22 separate occasions for infractions such as assault without serious injury (for spitting in a physician's face) and possessing a dangerous weapon on two separate occasions.[18]  Id.

---

[17]     The defendant points to the fact he has been transferred to "Phase 2" confinement as evidence of the defendant's good behavior while incarcerated.  See Def. Mar. Mem. at 45 ("Mr. El-Hage has been admitted to "Phase 2" of ADX's custodial program, which he earned for good behavior for at least one year.").  While that may be an encouraging development, it does not alter the fact that he was transferred to "Phase 2" approximately six months ago, meaning that he has been discipline free only for the past 1.5 years of the nearly 12 years that he has been incarcerated at ADX Florence.

[18]     The defendant attempts to explain away the pre-trial incident involving the defendant's having been found with a razor blade in his cell.  See Def. Mar. Mem. at 44.  While his explanation is dubious at best (i.e., "[t]he razor blade could have been secreted in that cell for an indeterminate amount of time, by any number of inmates"), el Hage makes no effort to explain the two additional instances where he was cited for possessing a dangerous weapon.  See Def. Mar. Mem. at 44-45.

Most tellingly, on June 22, 2009, there was a pretrial conference during which el Hage demanded that Judge Sand read aloud the entirety of a letter el Hage had written, which blamed the U.S. Government for the embassy bombings.  Judge Sand refused to read the letter verbatim, but summarized it for the record.  Later in the proceedings, el Hage leapt out of the jury box, where he had been seated with his co-defendants, and dashed toward the front of the courtroom, toward Judge Sand.  El Hage was tackled by a Deputy United States Marshal on the steps leading to the bench, a few feet past the exit door and several feet from Judge Sand.[19] Moreover, there was some evidence that this episode had been planned: according to a Deputy Marshal who was present at that proceeding, el Hage and co-defendant Mohamed al-'Owhali made eye contact before el Hage jumped out of the jury box.  Thereafter, when el Hage charged out of the jury box, al-'Owhali interfered with a Deputy Marshal who sought to pursue el Hage from behind.

Therefore, the nature of the defendant's crimes, including his efforts to obstruct justice, and even his conduct while incarcerated make clear that a sentence of life is necessary to deter criminal conduct, to protect the public from the defendant, and to promote respect for the law.  Such a sentence is also necessary because terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult.  See, e.g., United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists

---

[19]    The defense contends "that Mr. El-Hage's conduct did not demonstrate or manifest any intent to attack or assault Judge Sand (and constituted an irrational reaction to frustration while under significant stress)."  Def. Mar. Mem. at 44.  Because of this, the defense argues that the June 1999 incident "does not establish that Mr. El-Hage presents a danger upon release."  Id.  To the contrary, the Government respectfully submits that this incident demonstrates el Hage's unwillingness to show respect for the law and the judicial system.

and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").

The need for deterrence is particularly acute here.  In his submission, the defendant contends that there is no need for specific deterrence because "Mr. El-Hage demonstrated specific deterrence when he returned to the United States and attempted to live his life in Arlington, Texas, disconnected from al Qaeda and his co-conspirators."  Def. Oct. Mem. at 67.  That argument, however, is belied by the record adduced at trial.  Even after being confronted by U.S. authorities in August 1997, and even after returning to the United States, el Hage remained undeterred and continued to further al Qaeda's objectives by obstructing the FBI's investigation into al Qaeda's membership and activities.

Similarly unavailing is el Hage's claim that he does not present a danger of recidivism by virtue of his age and his "continued family support."  Def. Oct. Mem. at 67.  The defendant's own conduct here demonstrates how each of those contentions lack merit.  As described supra, el Hage's participation in these conspiracies was not an instance of youthful caprice or poor judgment.  El Hage   a college-educated man, in his mid-thirties, with a large family   made the calculated decision not only to join al Qaeda, but to work for the organization for several years.  Moreover, the role that he fulfilled in al Qaeda was not one that required youthful energy or physical strength, but rather intellect, business sense, and leadership ability.  These characteristics are unlikely to decline with age.  Further, the fact that el Hage had a family did not deter him from joining a terrorist organization, putting them at risk by continuing to work for that terrorist organization, or lying to the authorities when he was confronted with his participation in al Qaeda.  As such, there is nothing that suggests that his family would deter him

from engaging in similar crimes in the future.

Indeed, this case ilustrates the need to deter others who would commit similar crimes.  As Judge Walker has put it: "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part).  That terrible potential was realized here.  Imposing a life sentence will make it that much less likely that it will happen again.  It is important that those who are tempted to make similar choices to el Hage    not only to turn their back on, but actively to work against their country, and to support a violent terrorist organization    understand that they will be imprisoned for life.

### 3.    El Hage Should Receive the Same Sentence as his Co-Defendants

Another Section 3553(a) factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This implies that the defendant should receive the same sentence as his three co-conspirators, who were convicted along with him in 2001, as well as a sentence commensurate with that imposed by this Court on a fourth co-conspirator, Ahmed Khalfan Ghailani.  Each of these defendants    including el Hage    were critical cogs in the al Qaeda conspiracy that culminated in the Embassy bombings.  Treating like cases alike means ensuring that the defendant in this case should receive the same sentence as his co-conspirators: life in prison, with no chance of parole.

Against this conclusion, el Hage contends that a "life sentence for Mr. El-Hage, a 'facilitator' even by the government's characterization, would also be seriously disproportionate in light of the sentences imposed on the other three defendants convicted at trial, each of whom

was convicted for direct and deliberate participation in the substantive bombing offenses that resulted in more than 200 deaths." Def. Oct. Mem. at 68; see also Def. Oct. Mem. at 81.  But this misstates the evidence.  As noted supra, while the Government does not contend that el Hage built or detonated the bombs on August 7, 1998, he nevertheless played a crucial role in al Qaeda and his conduct   both before and after he left Kenya in 1997   was a critical component of the overarching conspiracies that resulted in the Embassy bombings.  Indeed, as Judge Sand concluded in 2001, el Hage's role in the al Qaeda conspiracies was at least as significant as his convicted co-conspirators, if not more so.

Further, the jury implicitly rejected el Hage's argument that he was somehow less culpable than his co-conspirators for the deaths that resulted from the Embassy bombings when it convicted him of participating in the conspiracies to murder United States nationals, to murder officers or employees of the United States, and to destroy United States property by means of explosives.  Indeed, like his three trial co-defendants, el Hage was convicted of a conspiracy to kill U.S. nationals that culminated in the 1998 Embassy bombings and resulted in the deaths of more than 200 individuals.  As Judge Sand noted at the 2001 sentencing with respect to el Hage's efforts to distance himself from the 224 deaths that were a direct and proximate result of the conspiracies for which he was convicted:

> Mr. El Hage may have convinced himself, he is capable of mind games, Mr. El Hage may have convinced himself that he is not responsible for the 214 deaths because, unlike some of the other defendants, he was not an actual deliverer of the bombs, and it may be difficult for him to understand that once one is a member of a conspiracy, one is responsible for the reasonably foreseeable acts taken by the co-conspirators in furtherance of that conspiracy, but the law is clear that that responsibility exists.  The Court finds that the evidence, beyond a reasonable doubt, shows that Mr. El Hage's membership in the conspiracy continued through all of the events which are recited in the indictment.

51

Ex A (10/17/2001 Sentencing Tr.) at 37.

Moreover, the description of el Hage's role in the conspiracies as "a facilitator" does not alter this calculus.  As Judge Sand concluded at the 2001 sentencing when he rejected this same argument:

> Do you want me to find that El Hage is the least culpable of the four defendants?
> I would not make such a finding.  Do not press me as to whether I think he is the
> most culpable of the four. . . .  [T]he notion that the facilitator, to use a term which
> I believe was first used in the government's summation and has been repeated in
> the papers, to suggest that the facilitator is less culpable than the low-level
> individual who ground up the explosive powder is not a set of values that I would
> subscribe to.  Facilitator of what?  Facilitator of the conspiracy to kill Americans.

Ex B (10/18/01 Sentencing Tr.) at 127-129.  See also United States v. Kassir, S2 04 Cr. 356

(JFK) (Judge Keenan sentenced the defendant to multiple terms of life in prison    for

establishing a jihad training camp and for distributing bomb-making manuals).

Similarly unavailing are the defendant's attempts to establish that he is less culpable than individuals who willingly disassociated themselves from al Qaeda years before the bombing.[20]

_____

██████████████████████████████     ████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████

       Finally, as to nationwide disparities, a life sentence is never routine, but life

sentences are regularly imposed in federal courts in cases like this one.  Courts routinely impose

very stiff sentences on defendants who are convicted of participating in consummated terror plots

as well as those that come close to completion.  See, e.g., United States v. Faisal Shahzad, 10 Cr.

541 (MGC) (S.D.N.Y. 2010) (life imprisonment for attempted bombing in Times Square, New

York); United States v. Mohammed Mansour Jabarah, 02 Cr. 1560 (BSJ) (S.D.N.Y. 2008) (life

imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the

Phillipines); United States v. Zacarias Moussaoui, 01 Cr. 455 (LMB) (E.D. Va. 2006) (life

sentence for conspiring in the attacks of September 11, 2001); United States v. Richard Reid, 02-

10013-WGY (D. Mass. 2003) (three life sentences upon a guilty plea for attempting to destroy

with explosives an in-flight commercial aircraft);  United States v. Mohammed Salameh, et al.,

93 Cr. 180 (KTD) (S.D.N.Y. 1999) (1993 bombing of the World Trade Center, resulting in six

deaths     effectively imposing life sentences); United States v. Terry Nichols, 96 Cr. 68-m (D.

Colo. 1998) (life imprisonment for conspiracy to bomb the Oklahoma City federal building

defendant acquitted of murder but convicted of manslaughter); United States v. Abdul Hakim

Murad, et al., 93 Cr. 180 (KTD) (S.D.N.Y. 1998) (life imprisonment plus 60 years imposed on

each of two defendants for a conspiracy to bomb United States airliners in Southeast Asia);

United States v. Omar Abdel-Rahman, 93 Cr. 181 (MBM) (S.D.N.Y. 1996) (life sentence for

seditious conspiracy); see also United States v. Timothy McVeigh, 96 Cr. 68-m (D. Colo. 1997)

(death sentence for the bombing of the Oklahoma City federal building, resulting in 168 deaths).

In the face of these precedents, the defendant cites to what he describes as a

"catalogue" of terrorism-related cases, which demonstrate "that a life sentence for Mr. El-Hage

would be disproportionate and create an unwarranted sentencing disparity."  Def. Oct. Mem.70-

80; see also Def. Mar. Mem. 23-26.  Although the defendant cites an extensive list of sentences

of less than life imprisonment meted out on defendants across the United States, his sentencing

submission fails to demonstrate any parity between the conduct underlying el Hage's convictions

and the defendants in the panoply of cases he cites to the Court.  Indeed, even a cursory review of

the sentences cited by el Hage demonstrates not only that the defendant's reliance on those

sentences is misplaced, but further underscores the propriety of a life sentence in this case.

Many of the cases on which the defendant relies pertain to defendants who were

convicted of providing material support and resources to foreign terrorists and/or foreign terrorist

organizations in violation of Title 18, United States Code, Section 2339A and/or 2339B

(collectively referred to below as "material support").  As the Court is aware, the material

support statutes carry a maximum penalty of 15 years' imprisonment.  See 18 U.S.C.

2339A(a)(1) & 2339B(a)(1).  Those cases, therefore, are inapposite; here the defendant was

convicted of two counts of conspiracies to commit terrorist acts, each of which carries a

maximum sentence of life.  As such, the cases on which the defendant relies do not support a

claim that a less than life sentence should be imposed here.  Indeed, many of the defendants who

were convicted under the material support statute received sentences either at or close to the

statutory maximum.[23]

The defendant himself acknowledges that the material support cases to which he cites are inapposite insofar as they are based on charges different from those of which el Hage was convicted, but nevertheless argues that "[c]onduct of the type Mr. El-Hage has committed has often been charged as 'material support' for terrorism."  Def. Oct. Mem. at 72 n.67.

The Court should reject this argument.  The defendant was convicted after trial of three separate conspiracies, the objectives of each of which were to kill U.S. nationals and/or destroy U.S. facilities abroad.  While there is no doubt that material support offenses constitute serious and deplorable crimes, Congress clearly has deemed the crimes of which the defendant was convicted to be far more serious as demonstrated by, inter alia, the vast gulf between the maximum penalties that could be imposed (i.e., 15 years' imprisonment as opposed to life imprisonment) as well as the fact that at least one of the counts of conviction, by statute, required "written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population."  See 18 U.S.C. 2332(d) (limitation on prosecution).[24]

---

[23]     Along similar lines, the defendant's "catalogue" includes convictions that were the result of undercover operations or "sting" operations.  While there is no doubt that the defendants in those cases engaged in serious, criminal conduct, those cases are inapposite to the facts here.  This is so because in the vast majority of sting operations, there is no actual threat to human life or public safety because of the involvement of the undercover law enforcement personnel.  Such was not the case here.

[24]     The Government further notes that defendant's citation to "the average sentence for persons charged with terrorism" as 236 months or 19.7 years is misleading in this context. See Def. Mar. 25 Mem. at 25.  As the report to which the defendant cites points out, that average was not a true average and did not adequately account for life sentences.  This is so because in calculating the terms of imprisonment, the report treated each life sentence as if it was a sentence

Accordingly, in order to avoid unwarranted sentencing disparities and to ensure that similarly situated defendants receive similar sentences, the Government respectfully submits that the Court should impose a sentence of life imprisonment here.

### 4. Imposing a Guidelines Sentence Would Advance the Goals of Section 3553(a)

Finally, these Section 3553(a) factors weigh especially heavily in favor of a Guidelines sentence of life imprisonment. As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors[.]" United States v. Rattoballi, 452 F.3d 127, 131 (2d Cir. 2006) (citations and internal quotation marks omitted. As the Supreme Court has put it, "to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S.Ct 586, 596 (2007). Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance another Section 3553(a) goal: "the need to avoid unwarranted sentence disparities."

*     *     *

In sum, each of the Section 3553(a) factors that is relevant here cuts powerfully in favor of a life sentence.

### B. El Hage Is Not Entitled to Sentencing Leniency on the Basis of Information He Was Compelled to Provide to the Government

Notwithstanding the above, the defendant contends that he is entitled to a sentence less than life imprisonment because he "was attempting to assist the government, and not conceal information from it, or obstruct its investigation." Def. Oct. Mem. at 52. To that end, the

---

of 30 years' imprisonment.

defendant concedes (as he must) that he lied with respect to the perjury counts, but that the information he provided to the Government was accurate in other respects. <u>See</u> Def. Oct. Mem. at 50-52. This argument should be rejected for the reasons previously stated. <u>See</u> <u>supra</u> Part III.A.2 (discussing the defendant's perjurous conduct in the context of deterrence and just punishment).

Simply put, The defendant cannot seek leniency based on his statements to the FBI or before the Grand Jury because he has clearly not "recognized the full implications of the choices [he] made in the past." <u>United States</u> v. <u>Fernandez</u>, 443 F.3d 19, 24 (2d Cir. 2006) (quoting Judge Cote). The defendant has not taken responsibility for his conduct with respect to the Embassy bombings. At trial, the defendant did not argue only that the Government had failed to carry its burden of proof, but rather that he was not a party to the conspiracies in which he was charged. Moreover, it appears that the defendant is today even less inclined to accept responsibility than he once was. In his nearly 150 pages of sentencing submissions, the core of the defendant's argument to the Court is that he had withdrawn from the conspiracies for which he was convicted before the Embassy bombings occurred. In addition, the defendant continually seeks to minimize his role in those conspiracies, and thereby limit his culpability for the foreseeable result of them.

In light of the scale of his crimes, and in the absence of genuine reformation, the defendant does not deserve any leniency on this basis.

### C.   El Hage's Conditions of Confinement Do Not Warrant Sentencing Leniency Under Section 3553(a)

Finally, the defendant contends that, under Section 3553(a), his sentence should

be reduced in light of his conditions of confinement.  See Def. Oct Mem. at 52-66; Def. Mar.

Mem. 31-34.  This argument is unavailing.

   In United States v. Carty, 264 F.3d 191 (2d Cir. 2001), the Court of Appeals held

that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for

downward departures" under the Sentencing Guidelines.[25]  264 F.3d at 208; see also, e.g., United

States v. Naranjo-Ramirez, No. 09-4343-cr, 2010 WL 4723301, at *2, *4 (2d Cir. Nov. 23, 2010)

(noting that sentencing Judges are "under no obligation to depart from the Guidelines on the

basis of [a defendant's] allegedly harsh pre-sentence confinement conditions," so long as they are

"consider[ed]") (emphasis in original).

   Following Carty, "the courts have granted relief generally where the conditions in

question are extreme to an exceptional degree and their severity falls upon the defendant in some

highly unique or disproportionate manner."  United States v. Mateo, 299 F. Supp. 2d 201, 211

(S.D.N.Y. 2004)(Marrero, J.); accord, e.g., United States v. Torres-Teyer, 322 F. Supp. 2d 359,

377-78 (S.D.N.Y. 2004) (Lynch, J.); United States v. Green, 04 Cr. 424-14, 2006 WL 3478340,

at *4 (S.D.N.Y. Dec. 1, 2006) (Sweet, J.).

   The extraordinary gravity of the defendant's crime utterly dwarfs any sentencing

consideration that the defendant should receive based on his conditions of confinement.  It is one

thing to reduce the sentence of an illegal re-entrant, as the Court did in the cases cited by the

defendant.  See Def. Oct. Mem. at 65 (citing United States v. Francis, 129 F. Supp. 2d 612, 619

(S.D.N.Y. 2001) (Patterson, J.)).  But el Hage was a high-ranking member of al Qaeda and

---

[25]  Carty involved a request for a downward departure under the Guidelines. However, the defendant cites Carty and its progeny in support of his Section 3553(a) conditions of confinement argument.  See Sentencing Letter at 18-27.  Accordingly, the Government relies on Carty in analyzing the Section 3553(a) argument.

participated directly in conspiracies that ultimately resulted in hundreds of deaths and thousands

of injuries.  See, e.g., United States v. Torres-Teyer, 322 F. Supp. 2d 359, 377 (S.D.N.Y. 2004)

(where defendant's Guidelines sentencing range was "about twenty years," concluding that

"[a]bsent evidence of truly horrific conditions, subjection to substandard detention conditions for

ten months does not warrant a meaningful departure from a twenty-year sentence.")  Id.

Similarly, on remand from the Court of Appeals in Carty, Judge Schwartz declined to depart

downward     citing, among other things, "the severity of [the defendant's] crimes."  See Exhibit

E (United States v. Carty, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001)) at 23-24.[26]

        Further, the Government submits that the conditions of confinement do not justify

a reduction in sentence because, as previously found by Judge Sand: (1) the conditions are the

result of the Bureau of Prison's ("BOP") administrative assessment of the security threat posed

by el Hage, and are subject to continuing review and amendment; and (2) el Hage's persistent

disciplinary problems provide further justification for their imposition.  See Ex. B (10/18/2001

Tr.) at ("Conditions of confinement as predicated here will be determined by the Bureau of

Prisons in light of the nature of the crimes, in light of the defendant's history while incarcerated,

---

[26]    Moreover, the relevant Sentencing Guidelines offense level here is 66, the Guidelines could yield a sentence of less than life in prison only if the defendant's offense level were reduced based on his conditions of confinement by an extraordinary 24 levels.  See U.S.S.G., Sentencing Table (indicating that at the defendant's Criminal History Category of VI, the Guidelines call for a minimum sentence of life unless the offense is 42 or lower).

    Twenty-four offense levels would be an enormous swing.  The Government has not located any conditions of confinement case in which there has been a departure approaching this magnitude.  The largest departure that the Government is aware of was one involving a reduction of nine levels.  See United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (Marrero, J.) (reducing a defendant's adjusted offense level by nine levels, because the defendant had been sexually abused by guards, and forced to give birth in her cell without the aid of a doctor and without pain medication).

and other facts and circumstances.  There is simply no basis for a downward departure of the basis of conditions of confinement.")).[27]

        The Sentencing Reform Act provides that once a person has been sentenced to a term of imprisonment, he "shall be committed to the custody of the BOP until the expiration of the term imposed."  18 U.S.C. § 3621(a) (1988).  The BOP is given a great deal of discretion with respect to the assignment of any prisoner to a correctional facility and makes such designation based on consideration of a number of factors, including, among others, the nature and circumstances of the offense, and the history and characteristics of the prisoner.  Id. at § 3621(b) (1988 & Supp. II 1990) (emphasis added).[27]  That discretion neither should be disturbed under the facts of this case, nor should it form the basis for a downward variance.  As discussed in more detail supra, el Hage has consistently posed a disciplinary and security threat while incarcerated.  The revised Presentence Report, dated September 11, 2009, chronicles the 22 disciplinary infractions that el Hage has incurred since he was sentenced in 2001.  See PSR at ¶¶ 42-50.  As such, el Hage's disciplinary record supports the conclusion that the conditions imposed are responsive to the threat posed by this defendant, rather than grounds for a "term materially less than life."

---

[27] The Government is not aware of any published cases granting a departure or below-Guidelines sentence pursuant to 3553(a) based on conditions of confinement under Special Administrative Measures.

[27]     SAMs are determined and imposed by the BOP in the interest of national security and are reviewed on a regular basis for continuing necessity.  In addition, federal regulations prescribe a mechanism by which inmates may appeal SAMs.  See 28 C.F.R. 501.3(e).  Because el Hage's conditions of confinement have been determined based on the severity of the charges of which he was convicted, and national security interests in preventing el Hage from passing dangerous messages to cohorts outside the prison, there is no basis for a reduction in sentence on these grounds.

Lastly, the defendant argues that a term of life imprisonment, particularly when viewed in light of his conditions of confinement, would be unjust in view of his family circumstances.  El Hage requests a below-Guidelines sentence in part because of the deleterious impact of his incarceration on his seven children, who range in age from eleven to twenty-two years old.  While the Government does not dispute the difficulties that El Hage's conduct and incarceration have inflicted upon his family, these circumstances are not exceptional in any way. The Sentencing Guidelines mandate that "family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." See U.S.S.G. § 5H1.6. A district court may depart on the basis of family circumstances only in exceptional circumstances, such as when the defendant is the sole caregiver to young children. See United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998); United States v. Johnson, 964 F.2d 124 (2d Cir. 1992); United States v. Galante, 128 F.3d 788, 788 (2d Cir. 1997) (in banc) (per curiam).  Those circumstances do not exist in this case.  As Judge Sand noted:

> With respect to family circumstances, Mr. El Hage has seven children who I believe he loves and I believe love him.  Incarceration is always a hardship for one's family, but in this case of all cases, hardly provides a basis for a downward departure.  It must be obvious to everyone in this courtroom, having heard today from victims, how incongruous it is for Mr. El Hage to seek leniency because he has a family.

Ex B (10/18/2001 Tr.) at 128.

Those concerns pale in comparison to the hardship and suffering that el Hage and his co-conspirators inflicted on the many victims of the Embassy bombings.  And they pale in comparison to the lies that he told the FBI to conceal the identities and locations of his co-conspirators.

In sum, the defendant's sentence should not be reduced based on his conditions of confinement or his family circumstances.  Moreover, as the analogy to the Sentencing Guidelines makes clear, reducing the defendant's sentence by enough to have a practical impact on the amount of time he spends in prison is to give the defendant an enormous benefit.  He does not deserve it.

## CONCLUSION

The Sentencing Guidelines call for a sentence of life; the Section 3553(a) factors call for a sentence of life; and the Probation Office has called for a sentence of life.  For all of the foregoing reasons, and for those previously set forth at the 2001 sentencing proceeding in this matter, the Government respectfully submits that a term of life imprisonment is the only sentence that is sufficient to meet the legitimate objectives of sentencing enumerated at Title 18, United States Code, Section 3553.

Dated:          New York, New York
                April 15, 2013


                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney


                        By:   /s/ Sean S. Buckley
                              Sean S. Buckley
                              Aimee Hector
                              Assistant United States Attorneys
                              (212) 637-2261/2203