**DOCKET**

LAW OFFICES OF
**DRATEL & MYSLIWIEC**
2 WALL STREET, 3RD FLOOR
NEW YORK, NEW YORK 10005
TEL (212) 732-0707
FAX (212) 571-3792
www.dratelmys.com

JOSHUA L. DRATEL
AARON MYSLIWIEC

ALICE L. FONTIER
LINDSAY A. LEWIS

STEVEN WRIGHT
*Office Manager*
RYAN DUFFEY
*Paralegal*

April 22, 2013

**BY HAND**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Wadih El-Hage*,
                 S(7)R 98 Cr. 1023 (LAK)

Dear Judge Kaplan:

      This letter constitutes defendant Wadih El-Hage's reply re-sentencing submission in response to the government's 62-page Sentencing Memorandum (hereinafter "Government's Submission"), dated April 15, 2013.

      Its length notwithstanding, the government's position can be reduced to but three basic assertions:

      (1)    that perjury could justify a life sentence;

      (2)    that every *conspiracy* to murder justifies a mandatory life sentence, regardless the defendant's particular conduct and participation, and regardless the statutory sentencing range; and

      (3)    that every terrorism case requires a life sentence as a deterrent, regardless of the absence of any empirical evidence to support that contention.

      Yet, as detailed below, the government's arguments are without merit. Indeed, the government's continual reference to Mr. El-Hage's perjury as a basis for a life sentence

LAW OFFICES OF

DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
April 22, 2013
Page 2 of 10

demonstrates most persuasively that he did not commit other *conduct* that would support such a sentence. Also, clearly, Mr. El-Hage's offenses of convictions are conspiracies that carry the *entire* range of sentencing options, from probation to life imprisonment, debunking the notion that a murder conspiracy conviction (and not even a homicide conviction itself) requires a life sentence. In addition, the catalogue of sentences in terrorism cases during the past twelve years demonstrates in both theory and practice that such cases and defendants do not require a life sentence for deterrence purposes.

In that context, the government's submission contains not a *single* mention of *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), discussed at length in counsel's March 25, 2013, letter. *Dorvee*'s absence from the government's submission, while glaring, is nevertheless understandable because the government's position is irreconcilable with *Dorvee*, and the government simply lacks any answer for *Dorvee*'s language and principles.

Also, as discussed below, the government's submission is replete with red herrings. For example, the government asserts, at 32, that the autobiography (*Al Qaeda Generation*) of Fazul Abdullah Mohammed (hereinafter "Harun") "thoroughly inculpates" Mr. El-Hage. Yet, Mr. El-Hage does not cite to Harun's Autobiography to challenge his conviction; rather, as is patent from any reading of counsel's March 25, 2013, letter, the value of Harun's Autobiography at *sentencing* is that it reduces Mr. El-Hage's relative culpability, and establishes that he was growing increasingly estranged from *al Qaeda* in 1996-97, culminating in his return to the U.S. in September 1997.

Moreover, the government simply reverses logic in its interpretation of certain evidence and events in an unavailing effort to either amplify or diminish their significance. For example, the government's claim that Mr. El-Hage's 1997 return to the U.S. was designed to further the conspiracy is completely contradicted by the record.

A.   *Mr. El-Hage's Offense Conduct*

1.   *Mr. El-Hage's Perjury Convictions*

In the government's submission, Mr. El-Hage's perjury constitutes the government's constant refrain. Indeed, the frequency of the references provides a compelling illustration that the government cannot point to *conduct* on Mr. El-Hage's part that could conceivably justify a life sentence.

Also, the perjury counts against Mr. El-Hage were related more toward shielding his own connections with the conspiracy, *i.e.*, disclaiming his signature and/or knowledge of certain

LAW OFFICES OF

DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
April 22, 2013
Page 3 of 10

documents, as well as his participation in the investigation of the 1996 accidental death of Abu Ubeidah al-Banshiri, rather than protecting any co-conspirators.

### 2.   *The Doctrine of Withdrawal*

The government's focus on the technical requirements for the legal defense of withdrawal as a means of avoiding liability *altogether*, rather than on the impact of withdrawal, or even *incomplete* withdrawal – especially occurring prior to the bombings themselves – on sentencing is merely a red herring. Nor is the government's misplaced concentration inadvertent; instead, it represents a transparent attempt to deflect attention from the effect of Mr. El-Hage's post-1996 conduct on his relative culpability, his substantially diminished level of commitment to *al Qaeda*, and, ultimately, his sentence.

### 3.   *Stinger Missiles*

The government predictably raises the issue of *al Qaeda*'s possible transport of Stinger missiles from Afghanistan to Sudan – which, according to Essam al Ridi, the witness who testified about that issue, never occurred to his knowledge, *see* Trial Transcript, at 562-64 – and Mr. El-Hage's alleged involvement therein.

However, the government neglects to mention that at trial it stipulated that the Afghan *mujahedeen*, the forerunners of *al Qaeda*, were in legitimate possession of Stinger missiles, as that weaponry had been provided to the *mujahedeen* by the U.S. after 1987 during the Afghan opposition to the 1979 Soviet invasion and 1980's occupation. *See* GX-30.

### 3.   *The Use of Fake Travel Documents*

Evidence, in the form of intercepted telephone conversations, was that fake travel documents were used by persons seeking to join the resistance to the Soviets in Chechnya. Also, despite the government's vague insinuation, at 17, there was neither evidence nor even suggestion at trial that Mr. El-Hage himself was schooled in the craft of forging travel documents. Also, the reference, at 18, to a passport-sized photo of Anas al Liby (found in boxes seized in Kenya in 1998), and Liby's involvement in conducting surveillance of the U.S. Embassy in Nairobi in 1993 (*not* 1994, as the government claims), is another red herring, as it was clear from the evidence at trial, including the testimony of government witness L'Housseine Kherchtou, that not only was Mr. El-Hage not aware of that surveillance, but he was *not even in Kenya at the time*. *See* counsel's March 25, 2013, letter, at 16 n. 13; counsel's October 28, 2009, letter, at 20.

LAW OFFICES OF
# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
April 22, 2013
Page 4 of 10

### 4. Mr. El-Hage's 1997 Return to the U.S.

The government's argument, repeated throughout, that Mr. El-Hage's September 1997 return to the U.S. from Kenya constituted a calculated decision to further the conspiracy, and an attempt to "hide in plain sight," is ludicrous. As a threshold matter, *federal law enforcement agents* implored Mr. El-Hage to leave Kenya and return to the U.S. with his family. *See* Trial Transcript, at 1078, 1097, 1100, 1334, 5360. In fact, Mr. El-Hage's departure from Kenya was a surprise to *al Qaeda* members and hierarchy. *See* counsel's October 28, 2009, letter, at 27-30. Indeed, several of the intercepted conversations – introduced at trial – involved Mr. El-Hage discussing with U.S. law enforcement agents his travel arrangements, and accepting their recommendations regarding route and time. *See, e.g.*, Trial Exhibits WEHX-W68-E, 54-E, 55-E, 56-E, 49-E, 57-E, 69-E. *See also* Trial Exhibit WEH-S-X9 (stipulation setting forth Mr. El-Hage's itinerary from Kenya to the U.S.).

Thus, Mr. El-Hage's departure from Kenya was at the behest of the U.S. government, and he acceded. Nor did he "hide in plain sight." In fact, upon his arrival in the U.S. (with his wife and children), Mr. El-Hage was met by U.S. law enforcement agents who seized all of his belongings, served him with a grand subpoena for testimony the following, transported his family to lodging near the airport, and whisked Mr. El-Hage to Manhattan for a meeting with Assistant United States Attorney Patrick J. Fitzgerald. Mr. El-Hage submitted to that interview, and then testified before the grand jury the entire next day. *See* October 28, 2009, letter, at 28-30.

Following that September 23, 1997, grand jury appearance, Mr. El-Hage returned to Texas with his family. Shortly thereafter, the government contacted him to seek an interview so Mr. El-Hage could repeat the information he provided in the grand jury to those not privy to those proceedings. Mr. El-Hage agreed to do so, and was interviewed in Dallas, Texas for that purpose. *See* October 28, 2009, letter, at 50 (and Exhibit 33 thereto).

Consequently, Mr. El-Hage remained on law enforcement's radar, even to the extent of FISA wiretap for the month following the August 1998 bombings – electronic surveillance that yielded not a single incriminating conversation. Also, following the bombings he was again interviewed by an FBI agent who visited Mr. El-Hage in his home.

### 5. The East African Cell

The government, at 12, claims that Mr. El-Hage "participated in secret meetings with Atef at El-Hage's residence[]" in Nairobi, citing the Trial Transcript, at 1258-59. However, there was no evidence Mr. El-Hage attended those meetings – which occurred at the guest house occupied by government witness L'Housseine Kherchtou, and *not* at the main residence occupied

LAW OFFICES OF

# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan<br>
United States District Judge<br>
Southern District of New York<br>
April 22, 2013<br>
Page 5 of 10

by Mr. El-Hage and his family – and there was evidence from Mr. Kherchtou that Mr. El-Hage did not attend other, similar meetings with other *al Qaeda* operatives who passed through Kenya and met with Mr. Kherchtou. *See* T. 1215-16, 1406, 1454-56.

The government, at 15, cites a Government Exhibit at trial, GX 310-73A-T, that it contends directed *al Qaeda*'s East African cell to "militarize." Yet that word – "militarize" – is the government's characterization, as the word does not appear anywhere in the translation of the document. Besides, even if it did use that word, and even if it had been authored by Mr. El-Hage (which the government did not prove), the entire document referred to *al Qaeda*'s designs on *Somalia*, in *1997*, three years *after* U.S. and U.N. troops had departed that nation.

Also, the government at first maintains, at 36-37, its position that Mr. El-Hage was the leader of the Kenyan *al Qaeda* cell, but subsequently acknowledges that he was not the leader, but merely someone with "authority." *See* Government Submission, at 42 n. 16. Yet the government abjectly refuses to factor that critical change into its sentencing calculation. Also, at 38, the government cites Mr. El-Hage's contact with Usama bin Laden and Abu Ubeidah al-Banshiri as evidence of Mr. El-Hage's authority, but at the same disclaims such a position for co-defendant Ihab Ali (who received a time-served sentence equating to nine years' imprisonment) – who also had frequent and direct interaction with both Mr. Bin Laden and Al-Banshiri. *See, e.g.*, March 25, 2013, letter, at 18-19.

Moreover, the government's most strident claims consist of pure rhetoric, devoid of citation or evidentiary support. *See, e.g.*, Government Submission, at 41, 43, 44. Similarly, the government's contention, at 48, that a life sentence is "necessary because terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult[,]" lacks even the slightest empirical support. Nor does the case citation following, making the same claim, alter the fact that there is *zero evidence* for such an assertion. Sentencing simply cannot be based on fictional popular notions that lack any factual foundation. The same is true with respect to deterrence: as is the case with respect to recidivism, there is not a single study or statistic that indicates that sentences of a particular length – much less *life* sentences – are a more effective deterrent in terrorism cases than sentences that do not reach that length.

**B.**     ***Sentencing Guidelines Issues***

In its assertion of the "law of the case" doctrine, the government fails even to attempt to confront the discussion in counsel's March 25, 2013, letter, at 49-50, that establishes beyond dispute that the "law of the case" is not an impediment to re-evaluation of certain Guidelines findings. Moreover, ultimately, the government concedes that new evidence provides a basis for re-evaluating the prior Guidelines determinations that Mr. El-Hage contests at re-sentencing.

LAW OFFICES OF
# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan<br>
United States District Judge<br>
Southern District of New York<br>
April 22, 2013<br>
Page 6 of 10

### C.   *Comparative Sentences*

The government's list of defendants who have received life sentences in terrorism cases manifestly proves Mr. El-Hage's point: each of those defendants – from Times Square bomber Faisal Shahzad to 9/11 conspirator and would-be suicide pilot Zacarias Moussaoui to shoe-bomber Richard Reid to Mohammed Jabarah (convicted of conspiring to bomb multiple U.S. Embassies overseas) to Mohammed Salameh (active participant in the first World Trade Center bombing) to Terry Nichols (mastermind of the Oklahoma City bombing) to Abdul Hakim Murad (active participant in Ramzi Yousef's and Khalid Sheik Mohamed's "Bojinka" plot to detonate explosives simultaneously on nine U.S. airline flights from Asia) to Sheik Omar Abdel Rahman (who inspired and authorized the plots to attack New York City landmarks) to Timothy McVeigh (who planted and helped construct the Oklahoma City device) – was *directly* involved in a *specific* terrorist plot aimed at U.S. civilians, with full knowledge and intent that the plot cause maximum death and destruction. Equating Mr. El-Hage with them defies logic, reason, and justice, and threatens to make a mockery of a sentencing system that mandates matching the individual defendant with his particular conduct and level of culpability.[1]

Similarly, the government makes the extraordinary argument, at 56 n. 23, that a defendant ensnared in a law enforcement sting operation, but who willingly engaged in a specific plot to

---

[1] The government, at 52, n. 20, seeks permission to make an *ex parte* submission (Ali Mohamed's plea agreement). Mr. El-Hage objects to any such submission. There is not any reason why that document cannot be provided under the same strictures as other discovery covered by the protective order in this case. Indeed, the government has not provided any reason why a 13-year-old plea agreement should remain under seal, and the growing proclivity toward maintaining a separate, secret docket runs directly counter to the principle of open and public proceedings. *See also* Magistrate Judge Stephen Wm. Smith (S.D. Tex.), *Gagged, Sealed & Delivered: Reforming ECPA's Secret Docket*, HARVARD LAW & POLICY REV., Vol. 6, 601-25 (2012) (lamenting the growth of a secret federal docket in national security matters).

Also, in that regard, at 53 n. 20, the government notes that the Court's protective order unsealing Ihab Ali's sentence precludes Mr. El-Hage's access to that information. However, the protective order in this case permits dissemination of "Particularly Sensitive" information – the designation the government has applied to Ihab Ali's sentence – to the defendant. Also, the government has not proffered any reason why such information should not be disclosed to Mr. El-Hage. Nor do counsel know of any case in which a sentencing remained sealed after the underlying case had been resolved, and/or the defendant released from incarceration. Again, the convenient tendency toward secrecy is a source of considerable concern to defense counsel, as a policy matter, as well in the particular context of this case.

LAW OFFICES OF
# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan  
United States District Judge  
Southern District of New York  
April 22, 2013  
Page 7 of 10

kill innocent civilians – often by planting or attempting to detonate the bombs themselves – are somehow less culpable than Mr. El-Hage because in those cases there existed "no actual threat to human life or public safety because of the involvement of the undercover law enforcement personnel." The twisted illogic of that contention provides further proof that the government cannot articulate a valid basis for a life sentence for Mr. El-Hage.

### D.      *The Recent Report by Physicians for Human Rights Regarding Solitary Confinement*

Earlier this month, Physicians for Humans Rights released *Buried Alive: Solitary Confinement in the US Detention System* (hereinafter "*PHR Report*"), available at <https://s3.amazonaws.com/PHR_Reports/Solitary-Confinement-April-2013-full.pdf>. As the *PHR Report* states, solitary confinement "is a generic term used to describe a form of segregation or isolation in which people are held in total or near-total isolation. People in solitary confinement are generally held in small cells for 23 hours a day and rarely have contact with other people." *Id.*, at 1.

That definition, of course, describes Mr. El-Hage's situation for the past fifteen years, and the duration of his sentence. As discussed in counsel's previous letters, Mr. El-Hage's conditions of confinement, while improved somewhat over time, are still onerous, and will remain so even with continued incremental improvement. As a result, that enhanced level of punishment – what he has already suffered, and that which he will suffer for the balance of his sentence – should be factored into computation of a sentence that is "sufficient but not greater than necessary" for Mr. El-Hage.

In that context, the *PHR Report* points out that "[a] review of the medical literature on solitary confinement provides convincing evidence that isolation has severe psychological and physical effects." *Id. See also id.*, at 8 ("[f]rom the outset, solitary has had deleterious psychological effects").

In fact, as the *PHR Report* adds, psychology professor and solitary confinement expert Craig Haney concludes that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects." *Id.*, at 1, *quoting* Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, Crime & Delinquency 49: 124-156, 132 (2003).

For example, the *PHR Report* notes that "[i]n 1977, a survey of studies resulted in the conclusion that every study of involuntary solitary confinement for more than 10 days documented negative psychiatric symptoms in its subjects."[] *Id.*, at 32 (footnote omitted).

LAW OFFICES OF
# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
April 22, 2013
Page 8 of 10

Also, while "primarily psychological[,] . . . researchers have also noted a number of corresponding physiological consequences among inmates held in solitary confinement." *Id.,* at 34

The *PHR Report* lists some of the maladies that afflict those held in solitary confinement: "Inmates and detainees held in solitary for even a short time commonly experience sleep disturbances, headaches, and lethargy. EEG studies of prisoners in solitary confinement demonstrate that their brain waves slowed markedly after as little as a week of isolation." *Id.*

The *PHR Report* also includes remarks by those who have endured and/or observed solitary confinement. For instance, Senator John McCain (R– Ariz.), reflecting on his experience as a prisoner of war, states that "[i]t's an awful thing, solitary. It crushes your spirit and weakens your resistance more effectively than any other form of mistreatment." *Id..*, at 8. Similarly, Sarah Shourd, a U.S. citizen who spent 410 days in solitary confinement in Iran for crossing the border into Iran, and spent 23 hours each day in her cell, and one hour daily in an indoor exercise area, recalls that

> [i]n prolonged isolation, the human psyche slowly self-destructs. On my worst days, I screamed and beat at the walls. I experienced hallucinations – bright flashing lights and phantom footsteps – nightmares, insomnia, heart palpitations, lethargy, clinical depression, and passive suicidal thoughts. I would pace my cell incessantly, or crouch like an animal by the food slot at the bottom of my cell door, listening for any sound to distract me. When I finally got books and television, I found it difficult to concentrate. I would sometimes spend an entire afternoon trying to read the same page, until I got fed up and threw my book against the wall."

*Id.,* at Foreward.

Nor is the reaction to solitary confinement a recent phenomenon. Charles Dickens, upon visiting Pennsylvania's Cherry Hill Prison in 1842, commented that solitary confinement "is a man buried alive . . . dead to everything but torturing anxieties and horrible despair." *Id.,* at 8. Likewise, Alexis de Toqueville, in 1826, after touring a New York prison, concldued that solitary confinement "devours the victims incessantly and unmercifully; it does not reform, it kills." *Id.* Overseas, after visiting a Swedish prison built on the Pennsylvania model, Hans Christian Andersen termed it "a well-built machine, a nightmare for the spirit." *Id.*

Those who have studied solitary confinement from a psychiatric, clinical perspective,

LAW OFFICES OF

DRATEL & MYSLIWIEC, P.C.

LAW OFFICES OF

# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
April 22, 2013
Page 9 of 10

concur. Stuart Grassian, M.D., another expert in the field, states that those inmates in solitary confinement "are in a sense in a prison within a priso[.]" *Id.*, at 31.

As a result, the reaction of international human rights bodies to solitary confinement has not been positive. As the *PHR Report* notes, "[g]iven the severe psychological and physical trauma that may result from solitary confinement, it is not surprising that international and regional human rights bodies have consistently held that solitary confinement should be the very rare exception, not the rule, and have repeatedly found conditions of solitary confinement to violate international prohibitions against torture." *Id.*, at 2.

In fact, the United Nations Special Rapporteurs on Torture and Other Cruel, Inhuman or Degrading Treatment concluded in both 2008 and 2011 that solitary confinement possessed the potential to constitute torture. *Id.*, at 28-29. *See also id.*, at 27 ("[i]nternational and regional human rights bodies have consistently held that solitary confinement should be the very rare exception, not the rule, and have repeatedly found conditions of solitary confinement to violate international prohibitions against torture"). *See also* at 28-29.[2]

Also, the Special Rapporteur in 2011 declared that solitary confinement can never be justified as a means of punishment or discipline "because it imposes severe mental pain and suffering beyond any reasonable retribution for criminal behavior." *Id.*, at 29. In addition, the Special Rapporteur "recently concluded that solitary confinement essentially becomes 'prolonged' at 15 days, after which some of the harmful psychological effects of solitary confinement may become irreversible.[]" *Id.*, at 32 (footnote omitted).

Moreover, as the *PHR Report* points out, " the U.S. government has vehemently condemned the use of solitary confinement and related forms when used by other countries in prison or detention facilities." *Id.*, at 30-31. Indeed, the Department of State's annual country reports have regularly criticized nations for their reliance on solitary confinement. Reflecting that scrutiny inward, Senator Richard Durbin (D – Ill.), presiding over the U.S. Senate's hearings last summer on the subject, announced that the "dramatic expansion of solitary confinement is a human rights issue we [cannot] ignore." *Id.*, at 10.

The conditions of Mr. El-Hage's incarceration have been, and will continue to be even if

---

[2] The governments attempts to make much of Mr. El-Hage's record of infractions while in custody. However, that conduct – the overwhelming majority of which has involved insubordination, and which is addressed in counsel's March 25, 2013, letter – more than likely is the product of Mr. El-Hage's solitary confinement, as he exhibited none of that behavior prior to his imprisonment.

LAW OFFICES OF

# DRATEL & MYSLIWIEC, P.C.

Hon. Lewis A. Kaplan<br>
United States District Judge<br>
Southern District of New York<br>
April 22, 2013<br>
Page 10 of 10

his sentence is less than life imprisonment, among, if not the most, severe experienced by any federal inmate in modern U.S. history. As a result, his daily existence has been as desolate as any for that duration. In response, the government, at 62, contends that "[t]hose concerns pale in comparison to the hardship and suffering that [Mr. El-Hage] and his co-conspirators inflicted on the many victims of the Embassy bombings. And they pale in comparison to the lies that he told the FBI to conceal the identities and locations of his co-conspirators."

Yet sentencing is not an exercise in inflicting maximum or even like punishment. Over the past 2,000 years, jurisprudence has evolved from a strict application of the retributive Babylonian and later Roman law of *talion* – that the punishment be identical to the crime[3] – to a more humane, prospective, Constitutional, and just doctrine of "sufficient, but not greater than necessary." Here, Mr. El-Hage's unparalleled tenure of solitary confinement requires a sentence of less than life imprisonment to fulfill that mandate.

## Conclusion

Accordingly, for all the reasons set forth above, including those set forth previously in the several sentencing and re-sentencing submissions filed on Mr. El-Hage's behalf, it is respectfully submitted that he should be sentenced to a term of imprisonment substantially below a life term.

Respectfully submitted,<br>
<br>
Joshua L. Dratel<br>
<br>
Sam A. Schmidt

JLD/

cc:   Aimee Hector
      Sean S. Buckley
      Assistant United States Attorneys

---

[3] According to the Encyclopaedia Britannica online, *lex talionis* was a "principle developed in early Babylonian law and present in both biblical and early Roman law that criminals should receive as punishment precisely those injuries and damages they had inflicted upon their victims. Many early societies applied this "eye-for-an-eye" principle literally." *See* <http://www.britannica.com/EBchecked/topic/581485/talion>.